**David PHILLIPS, Plaintiff,**

v.

**PEMBROKE REAL ESTATE, INC., Defendant.**

**No. CIV.A.03–11542–PBS.**

United States District Court, D. Massachusetts.

Oct. 24, 2003.

Andrew D. Epstein, Barker, Epstein & Loscocco, Boston, MA, for Plaintiff.

Scott P. Lewis, Marc J. Goldstein, Thane D. Scott, Palmer & Dodge LLP, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

This case raises novel and important issues about the rights of artists under federal and state law to prevent the modification or destruction of their works of visual art. Plaintiff David Phillips, a well known sculptor, brings this action pursuant to the Visual Artists Rights Act, 17 U.S.C. § 106A (1990) ("VARA"), and the Massachusetts Art Preservation Act, Mass. Gen. Laws Ann. ch. 231, § 85S (1984) ("MAPA"). He seeks a preliminary injunction to prevent Defendant Pembroke Real Estate, Inc. from modifying Eastport Park, which Phillips helped design, and from altering his sculptures, which were specifically created for that public park.

The Court held an evidentiary hearing in which the Plaintiff Phillips; Ricardo Barreto, the Executive Director of the Urban Arts Institute at the Massachusetts College of Art; Konstantine Krekis, the Director of the Architect Resource Group at Pembroke, an arm of Fidelity Investments; and Michael Shaughnessy, a rigger and engineer, testified. The Court also took two views of the property.

The Court holds that federal law provides no protection for the placement of site-specific sculpture. However, under the broader protections of state law, Plaintiff has demonstrated a likelihood of success in showing that he has the right to prevent the alteration of his site-specific sculptures that would result from moving them to another location. There is no provision in the written contract between

the artist and the purchaser waiving this right.

Based on the testimony, the views, and the submissions, the Court orders Pembroke not to destroy, alter, modify or move Phillips' sculpture along the northwest-southeast axis of the Park.

## I. FACTUAL BACKGROUND

### A. *The Park*

Eastport Park, in the South Boston Waterfront District of Boston, is located across from Boston Harbor. It is a public sculpture park with a nautical theme. Plaintiff's sculptures include a large, abstract sculpture entitled "Chords," a large bronze seashell, bronze hermit crabs, frogs and shrimp, and a bronze medallion with Zodiac signs crowning an S-shaped circular path. Three others also created art located in the Park. Judy McKie crafted bronze benches in the shape of fish; landscape architect Craig Halvorson (the designer of the park at Post Office Square) designed a pergola (an arbor on the new Congress Street side); and Japanese sculptor Susumu Shingu constructed towering kinetic sculptures. The Park contains large granite boulders and the paths are inlaid with granite paving stones. The plantings are scrubby to simulate a marine environment.

Pembroke, a Fidelity Investments company, leases the land upon which the Park is built from the Massachusetts Port Authority ("Massport"), which must approve any changes to the design of the Park. The Boston Redevelopment Authority ("BRA") must also approve changes. The Park must be open to the public free of charge 24 hours a day. According to the *Boston Business Journal,* this is the only privately-managed public park in the City of Boston.

The Park is roughly rectangular in area, and extends to the sidewalks running along Seaport Boulevard on the north, New Congress Street on the south, and D Street on the east side. The World Trade Center East Office building stands on the west side. The Park is currently in the midst of extensive construction known locally as "The Big Dig," which includes the development of new office buildings and the construction of a new convention center. Another park is being developed by Massport across D Street.

### B. *The Artist*

Over the past twenty years, Phillips has earned numerous commissions for sculptures at universities, private companies and public spaces in Massachusetts, Connecticut, Washington, D.C., New York, Utah, Kofu and Tokyo, Japan, and Colombia, South America. His work is exhibited in galleries and museums in New York City, Maine, and elsewhere. He works primarily with stone and bronze forms that he integrates with the environment. In many sculptures, Phillips incorporates the designs of the stones into the landscape. For example, in one private project in Ogunquit, Maine, he sought to extend the band of the rock into a bronze tributary in the ground that glistened in the sun like a nearby stream. Phillips frequently uses a spiral motif. Many of his works seek to seamlessly merge metals or polished stone with aged, naturally-shaped boulders. Some of his better-known local pieces include six large bronze frogs in the Boston Common Frog Pond Playground, sculpture at the Porter Square Subway Station in Cambridge, the "Water Strider Fountain" at the Christian Science Reflection Pond, and a sculpture at Quincy Square near Harvard Square, Cambridge. He has been featured in art magazines, in both the United States and Japan.

Phillips enjoys a national reputation and is particularly well known for his work in creating sculpture which is site-specific, meaning that it depends on the surrounding landscape. His 1993 promotional brochure describes his artistic vision: "It is Phillips' inherent reverence for natural beauty in this ecologically ravaged world that influences all his decisions, particularly when he recontextualizes a stone by replacing part of its form with a man-made surrogate or when he gracefully applies typical landscaping and architectural materials along with natural stone and traditional art materials into new equations of form and function." (Ex. 19, at 4–5.)

### C. *Phillips' Work at the Park*

Pembroke hired Phillips in 1999 to work on the Park in conjunction with the development of the World Trade Center East office building, which stands adjacent to the Park. Phillips' responsibilities were manifold. Phillips worked closely with Craig Halvorson, the renowned landscape architect, on the design of the Park. He had an oral agreement with Halvorson (but not Pembroke) to assist in the work at the design meetings as the artist who worked with the landscape specialists. For example, he helped design the repeated spirals on the axis running from the northwest corner towards the southeast.

In August of 1999, Pembroke and Phillips executed the Eastport Park Artwork Agreement, pursuant to which Phillips was responsible for creating approximately twenty-seven (27) sculptures for placement in the Park. They included fifteen (15) abstract sculptures, and twelve (12) realistic bronze sculptures of crabs, shrimp, and frogs. Pursuant to the Eastport Park Stonework Agreement with Pembroke executed in June of 1999, Phillips also selected and directed the placement of mosaic paving stones, granite feature strips, and

rough stone walls at the base of the sculpture "Chords." He personally carved finished granite for "Chords," the centerpiece of the Park. Phillips worked with a stone mason to select and place the rough quarried stone covered with lichen from Maine. He also designed the granite path culminating in the bronze medallion, the "outpost sculptures," and the free flowing curve motifs. He specially selected the large granite stones that he used as part of his sculptures to reflect the large granite stones along Boston Harbor.

Phillips believes that his sculptures and related stonework are works of visual art specifically designed for Eastport Park and are meaningful only if they remain in Eastport Park.

### D. *Re–Design of the Park*

The Park was completed in the spring of 2000. In 2001, Pembroke decided to make certain changes to the Park, and hired London landscape artist Elizabeth Banks to direct the changes. Konstantine Krekis, the director of the Architectural Resource Group within Pembroke, was part of the original design team. Pembroke believed there were conceptual problems with the Park and wanted substantially more plants for better shade and simplified walkways. It also wanted to replace the river rock, which turned out to be a maintenance problem. Krekis summed up: "The aesthetic vision of the Park has changed." The re-design originally called for the removal and relocation of Phillips' sculptures from the Park. Upon Phillips' objections, Pembroke altered its plans. The new redesign plans, presented at the August 21, 2003 hearing, called for the retention of all but one of Phillips' sculptures within the Park, retention of his rough stone walls, relocation of the split granite paving fabricated by Phillips to enhance the Chords and medallion sculp-

tures, and changes to several of the walkways and finished granite objects within the Park. At the end of the August 21 hearing, the Court issued a temporary restraining order enjoining Pembroke from making the changes it had indicated would be made pursuant to its then-current plans until the Court could rule.

At the September 8, 2003 hearing, counsel for Pembroke announced that Pembroke was pursuing the original re-design for the Park, under which all of Phillips' work would be removed, and that Pembroke had already initiated work on this plan by starting to remove the pergola. On October 2, 2003, the Court extended the order until it could rule.[1]

Pembroke intends to donate, relocate or store Phillips' art. It hired a rigger and engineer to dismantle and store the art.

### E. *Site–Specific Art*

As the Executive Director of the Urban Arts Institute of the Massachusetts College of Art and the Program Director of the Massachusetts Cultural Council, Plaintiff's expert, Ricardo Barreto, is involved in the selection of artists to create art in public spaces, including the Big Dig and the Deer Island Point. From 1993–1994, he was the program coordinator for the Central Artery/Tunnel Project Arts Program at Bechtel/Parsons Brinkerhoff, where he was "responsible for the public art projects for the $12 billion [his figure] highway project." (Ex. 1.)

According to Barreto, today the concept of "site specificity" is the "rallying cry" of public artists who seek to create a piece that derives enhanced meaning from its environment. Much of modern sculpture does not exist separate from its context, but rather integrates its context with the work to form, ideally, a seamless whole. (*See also* Aff. of Ellen Driscoll).

Plaintiff's experts state that for site-specific art, the location of the work is a constituent element of the work. Daniel Ranalli, Professor of Art History and Director of the Graduate Program in Arts Administration at Boston University, stated: "Beginning at least with the last third of the 20th century, and continuing through the present, the notion of *sculpture* has undergone a radical redefinition. In essence, sculpture has come off its pedestal, functioning in the space in and around its site, and playing an integral role in *defining* that space."

Under this approach, because the location defines the art, site-specific sculpture is destroyed if it is moved from the site. *See* Francesca Garson, Note, *Before That Artist Came Along, It Was Just A Bridge: The Visual Artists Rights Act and the Removal of Site–Specific Artwork*, 11 Cornell J.L. & Pub. Pol'y 203, 211 (2001) ("It is clear that the community of respected American artists and art authorities regard the crafted work and the site of site-specific artworks as an indivisible whole. The artists who create these works explain that the meaning and purpose behind the art lie squarely within its physical location.") "This view contrasts with so-called 'plop-art' where a separately conceived art object is simply placed in a space." (Halvorson Aff. at ¶ C2.) Barreto testified: "Very often a client and an artist will discuss [how long site-specific art is to

1.   The Order stated in part:

Pursuant to the Visual Artists Rights Act ("VARA"), 17 U.S.C. §§ 101 and 106A, and the Massachusetts Art Preservation Act, Mass. Gen. Laws ch. 231, § 85S, I temporarily enjoin any modification, destruction or removal of Plaintiff's stonework, bronzework, or sculpture, including any internal sidewalks, pavings, and benches, along the diagonal in the Eastport Park. This Order does not apply to plantings and grass in this area, or to any art by other artists.

remain in place] and come to an agreement right up front," as Massport has often done for works it has commissioned for Boston Logan Airport, so that "the artist knows it right up front and knows exactly what they're getting into." (Tr. at 86–87).

Barreto became aware of Phillips' work a decade ago from catalogs and Phillips' work in Porter Square. He believes that Phillips is "one of the most important artists in this area" and that he has a "national reputation." He testified that Phillips' art work in Eastport Park was discussed at a national meeting of the Public Art Network held in Portland, Oregon. According to Barreto, Phillips' sculptures at the Park form an integrated design that comprises a coherent whole. Phillips' placement of the paving stones around the "Chords" sculpture, the plinth (the raised platform) on which "Chords" sits; and the continuous line of bronze integrates the many pieces of "Chords." He also believes that the "repeated spirals" in the Park are a unifying design element throughout the Park, and teaches that the Park itself is a sculpture of the environment. However, he concedes that a park does not meet the traditional definition of sculpture that involves an object with "formal elements" (although he notes that he instructs his students that a park like this is sculpture). Barreto testified that if Phillips' sculpture is moved, it will have an impact on his reputation as an artist because he will no longer have an important piece in an important location: his art will be "in exile."

## II. ANALYSIS

### A. Preliminary Injunction Standard

Plaintiff, as the moving party seeking a preliminary injunction, must meet four criteria before an injunction can issue. The Court must find: (1) that Plaintiff has exhibited a likelihood of success on the merits; (2) that Plaintiff will suffer irreparable injury if the injunction is not granted; (3) that such injury outweighs any harm which granting injunctive relief would inflict on the Defendant; and (4) that the public interest will not be adversely affected by the granting of the injunction. See Suarez–Cestero v. Pagan–Rosa, 172 F.3d 102, 104 (1st Cir.1999); TEC Eng'g Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 544 (1st Cir.1996). Plaintiff bears the burden of making each of these showings. See Int'l Ass'n of Machinists and Aerospace Workers v. Eastern Air Lines, Inc., 826 F.2d 1141, 1144–45 (1st Cir.1987) (citing Planned Parenthood League of Mass. v. Bellotti, 641 F.2d 1006, 1009 (1st Cir.1981)).

### B. Likelihood of Success

#### 1. VARA

##### a. The Legislation

Defendant argues that: (1) the Park itself is not a work of visual art protected by VARA; and (2) Plaintiff has no right to the public presentation of his sculptures in the Park under VARA.

The Court must engage in an analysis of the Visual Artists Rights Act of 1990 ("VARA") to address these issues. VARA provides that the "author of a work of visual art":

(3) subject to the limitations set forth in section 113(d), shall have the right–

(A) to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right, and

(B) to prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right.

17 U.S.C. § 106A(a)(3)(A) and (B). The authors of a joint work of visual art are co-owners of these rights. § 106A(3)(B).

As an exclusion, Section 106A(c)(2) provides:

The modification of a work of visual art which is the result of conservation, *or of the public presentation, including lighting and placement,* of the work is not a destruction, distortion, mutilation, or other modification described in subsection (a)(3) unless the modification is caused by gross negligence.

(emphasis added). A "work of visual art" is defined to include "a painting, drawing, print or sculpture, existing in a single copy" or in a limited edition. 17 U.S.C. § 101. Works made for hire, works of applied art, and works not otherwise subject to copyright protection are excluded. *Id.* These rights exist for the life of the last surviving author of a work created by more than one artist. 17 U.S.C. § 106A(d)(3). Any waiver of rights by an artist must be in writing. § 106A(e)(1).

██ The legislative history of VARA explains that it:

protects both the reputations of certain visual artists and the works of art they create. It provides these artists with the rights of 'attribution' and 'integrity' .... These rights are analogous to those protected by Article 6*bis* of the Berne Convention, which are commonly known as 'moral rights.' The theory of moral rights is that they result in a climate of artistic worth and honor that encourages the author in the arduous act of creation.

*Carter v. Helmsley–Spear, Inc.,* 71 F.3d 77, 83 (2d Cir.1995) (*Carter II*) (citing H.R.Rep. No. 101–514, at 5, *reprinted in* 1990 U.S.C.C.A.N. 6915, 6917). "With numerous exceptions, VARA grants three rights: the right of attribution, the right of integrity and, in the case of works of visual art of 'recognized stature,' the right to prevent destruction." *Id.* The legislative history also indicates that "[w]hile no per se rule exists, modification of a work of recognized stature will generally establish harm to honor or reputation." H.R.Rep. No. 101–514, at 14, U.S.Code Cong. & Admin.News 1990, pp. 6915, 6926.

The term "recognized stature" is not defined by statute. Two courts have adopted the following stature test: "(1) that the visual art in question has 'stature,' i.e., is viewed as meritorious, and (2) that this stature is recognized by art experts, other members of the artistic community, or by some cross-section of society." *Martin v. City of Indianapolis,* 192 F.3d 608, 612 (7th Cir.1999) (citing *Carter v. Helmsley–Spear, Inc.,* 861 F.Supp. 303, 325 (S.D.N.Y.1994) (*Carter I*)). Generally, the court will make this determination based on expert testimony. *Id.*

### b. *"Work of visual art"*

██ The first question is whether Phillips' twenty-seven (27) sculptures constitute a single work of visual art or instead are discrete works of art that must be treated separately under VARA. A related issue is whether the Park as a whole should be treated as a work of visual art. While Defendant argues that the entire Park, and certain stone design elements within the Park, are not works of visual art under VARA, it does not dispute that the twenty-seven (27) abstract and realistic sculptures created by Phillips, including the bronze star chart medallion and "Chords," are sculptures within the meaning of 17 U.S.C. § 101.

Phillips takes the position that his artwork extends beyond these individual sculptures and includes the finished and rough-hewn granite and stone pavings and the stone walls that he designed and

placed, including the "Chords" path and the medallion path (the "Stone Elements"). He also contends that all of his sculptures form one integrated, interrelated work of visual art. To place the sculptural elements in different alignments relative to one another, Plaintiff believes, would destroy sight lines and alter the deliberately-crafted spatial relationships among the paths, granite walls, and individual pieces of sculpture.

Congress has provided a "narrow definition of works of visual art." *Carter II*, 71 F.3d at 84. Legislative history indicates the reason Congress did so was to avoid conflict with other aspects of the Copyright Act, specifically sections applicable to movies and videos. *See* H.R.Rep. No. 101–514, at 9.

Despite the narrow definition, courts have held that works composed of a variety of pieces and in a variety of media may still constitute one work of "visual art" under VARA. *Carter II*, 71 F.3d at 83–84 (affirming district court holding that entire lobby of a building, composed of many separate sculptural and applied art elements, was a "single, indivisible whole" meeting the definition of "work of art" in VARA, but reversing on other grounds); *English v. BFC & R East 11th St. LLC*, 1997 WL 746444, *3 (S.D.N.Y.1997) (noting that *Carter II* offered support for contention that entire garden was a single work of visual art under VARA, but holding that VARA was inapplicable to artwork illegally placed on property); *Pavia v. 1120 Ave. of the Americas Assoc.*, 901 F.Supp. 620, 627–28 (S.D.N.Y.1995) (denying defendant's motion to dismiss on the grounds that plaintiff could establish that four separate bronze forms that had been separated by defendants were one "work of art").

The legislative history instructs courts to "use common sense and generally accepted standards of the artistic community in determining whether a particular work falls within the scope of the definition. Artists may work in a variety of media, and use any number of materials in creating their works. Therefore, whether a particular work falls within the definition should not depend on the medium or materials used." H.R.Rep. No. 101–514, at 6, U.S.Code Cong. & Admin.News 1990, pp. 6915, 6921.

With this caselaw in mind, the Court finds that Plaintiff has a likelihood of proving that the sculptures along the northwest to southeast axis of the Park, including "Chords" and the medallion sculpture, as well as the Stone Elements, are one integrated "work of visual art." It begins with a spiral in the northwest corner along Seaport Boulevard, includes Plaintiff's "Chords" sculpture, and continues along a spiral path of mosaic paving stone, culminating in the bronze medallion. In determining that the sculptures along this axis, as well as the related Stone Elements, are one work of visual art, the Court relies on the integrated marine theme and recurring spirals, as well as the use of marine granite boulders and pavers. However, the remainder of the sculptures (like the six-foot bronze conch shell and miscellaneous whimsical sea creatures) that do not lie along the axis are not part of the same work of visual art. While these sculptures share the marine theme, the Court finds these pieces are individual free-standing pieces of sculpture, which are not integrated into the other pieces by spirals or granite.

■ One novel issue is whether a park can be a "work of visual art" under VARA. Phillips contends that the Eastport Park as a whole is one large integrated piece of "sculpture." He proclaims: "If any of Phillips' sculptures or any of the features of the Park are removed, there will be modification of Phillips' concept, and it will

have an impact on the rest of his work. If this means that Eastport Park must be declared to be an inviolate work of art, then so be it." Plaintiff's Supp. Mem. at 17.

The Court rejects Plaintiff's argument that the Park as a whole is a work of visual art. As Professor Barreto conceded, a park does not fit within the traditional definition of sculpture,[2] and the definitions in VARA are to be construed narrowly. Conceivably, a sculptor could design a sculpture garden that includes multiple inter-related sculptural elements that form an integrated work of visual art. *See, e.g., English v. BFC & R East 11th Street LLC,* 1997 WL 746444 at *3 (suggesting that the entire garden was a single work of art under VARA). However, here, many elements in the Park were not created by Phillips. These include the pergola, three bronze benches, several chairs, and two kinetic sculptures. Substantial areas of the Park are unrelated to Phillips' sculpture and not integrated with it (for example, the area adjacent to the pergola or the area near the office building). Phillips was also not responsible for the plantings or any of the landscape architecture apart from the stone elements. Mr. Halvorson is himself a renowned landscape architect, and he was the one hired to design the Park. As Mr. Halvorson points out, Phillips contributed ideas about the artistic vision of *his* artwork for the Park, and suggestions about how the Park design could provide a suitable setting and context for his work. (Halvorson Aff. ¶ C). While Phillips certainly assisted in designing the stone elements in the paths and walls and in placing his own sculptures, the Park as a whole is not an integrated work of art.

Therefore, I conclude that Plaintiff has not established a likelihood of success in proving that this Park as a whole is a work of visual art under VARA.

### c. *"Public Presentation" Exclusion*

■ Plaintiff also argues that his work is so site-specific that moving it would be an intentional destruction or modification under VARA. Taking the sculpture from its current location and locating it on a private campus in Rhode Island not near the ocean, as Defendant has offered to do, would be like painting over the background landscape in the Mona Lisa.

Defendant contends that the "public presentation" exclusion in § 106A(c)(2) permits it to move Plaintiff's sculptures from their current placement to another, just as the statute would not prevent a curator from moving the Mona Lisa from one wall in the Louvre to another.

Section 106A(c)(2) has been interpreted to exclude from VARA's protection "site-specific" works, works that would be modified if they were moved. *See Board of Managers of Soho Int'l Arts Condo. v. City of New York,* 2003 WL 21403333, *10 (S.D.N.Y.2003) (stating that the point of VARA "is not ... to preserve a work of visual art *where* it is, but rather to preserve the work *as* it is"); *aff'd on recons., Board of Managers of Soho Int'l Arts Condo. v. City of New York,* 2003 WL 21767653, *3 (S.D.N.Y.2003) ("[N]owhere in VARA does the statute make any legal distinction between site-specific or free-standing works" in regards to "site-specific" art).

---

**2.** "Sculpture" is defined as "the art of carving, modeling, welding, or otherwise producing figurative or abstract works of art in three dimensions, as in relief, intaglio or in the round"; "such works of art, collectively"; "an individual piece of such work." *Random House Webster's College Dictionary* 1724 (2d ed.1993).

Plaintiff responds that VARA provides protection for a work of visual art that "has been incorporated in or made part of a building in such a way that removing the work from the building will cause the destruction, distortion, mutilation, or other modification of the work as described in section 106A(a)(3)," 17 U.S.C. § 113(d), and that art attached to real property that cannot be removed without destruction should have similar protection. Defendant's legal argument is more persuasive because it is rooted in the plain language of the exclusion in § 106A(c)(2) as well as the statute's legislative history. "Generally, the removal of a work from a specific location comes within the [presentation] exclusion because the location is a matter of presentation." H.R.Rep. No. 101–514, at 12, U.S.Code Cong. & Admin.News 1990, 6915, 6927. It is notable that the public presentation exception was crafted after the widely-publicized dispute between the General Services Administration and the artist Richard Serra over the removal of Serra's "site-specific" piece "Tilted Arc." *See Serra v. United States Gen'l Serv. Admin.*, 847 F.2d 1045 (2d Cir.1988) (rejecting Serra's argument that the removal of a government-owned artwork from federal property violates the free expression and due process rights of the artist). Despite "le droit moral," Congress adhered to "chacun a son gout" (each one to his taste) by declining to require the public presentation of art.

■ I conclude that an artist has no right to the placement or public presentation of his sculpture under the exception in § 106A(c)(2). Defendant is not obligated to display the works in the Park, as VARA provides no protection for a change in placement or presentation. However, under VARA, Defendant is under an obligation not to alter, modify or destroy the "works of visual art" as I have defined them.

### 2. *MAPA*

#### a. *The Statute*

The rarely-litigated Massachusetts Art Preservation Act ("MAPA") provides broader protection to artists than the federal statute. In MAPA, Mass. Gen. Laws Ann. ch. 231, § 85S(a) (1984), the Massachusetts legislature found:

> [T]he physical alteration or destruction of fine art, which is an expression of the artist's personality, is detrimental to the artist's reputation, and artists therefore have an interest in protecting their works of fine art against such alteration or destruction; and that there is also a public interest in preserving the integrity of cultural and artistic creations.

"Fine art" is defined to mean "any original work of visual or graphic art of any media which shall include, but not limited to, any painting, print, drawing, sculpture, craft object, photograph, audio or video tape, film, hologram, or any combination thereof, of recognized quality." Section 85S(c) provides:

> No person, except an artist who owns or possesses a work of fine art which the artist has created, shall intentionally commit, or authorize the intentional commission of any physical defacement, mutilation, alteration, or destruction of a work of fine art. As used in this section, intentional physical defacement, mutilation, alteration, or destruction includes any such action taken deliberately or through gross negligence.

Section 85S(f) provides:

> In determining whether a work of fine art is of recognized quality, the court shall rely on the opinions of artists, art dealers, collectors of fine art, curators of art museums, restorers and conserva-

tors of fine art and other persons involved with the creation or marketing of fine art.

This right continues until the fiftieth anniversary of the death of the artist, and cannot be waived except by a written instrument signed by the artist. § 85S(g).

MAPA defines an artist to be "the natural person who actually creates a work of fine art but not to include such art as is created by an employee within the scope of his employment." § 85S(b). "In case of a joint creation of a work of art, each joint creator shall have the rights of an artist with respect to the work of fine art as a whole." *Id.*

The Act deals separately with "fine art [that] cannot be removed from a building without a substantial physical defacement, mutilation, alteration or destruction of such work." § 85S(h). As to these works, the rights and duties created under the Act are forfeited, "unless expressly reserved by an instrument in writing signed by the owner of such building and property recorded prior to the installation of such art." *Id.*

■ The Supreme Judicial Court of Massachusetts explained in *Moakley v. Eastwick,* 423 Mass. 52, 666 N.E.2d 505 (1996), the only reported decision construing the statute, that MAPA followed the lead of similar legislation in California and New York "in attempting to graft onto a generally inhospitable common law tradition the civil law concept of *droit moral* whereby a creative artist retains certain inalienable rights with respect to his or her creation before and after publication, display or sale."[3] *Id.* at 509 (citing Vance R. Koven, *Observations on the Massachusetts Art Preservation Act,* 71 Mass.

L.Rev. 101, 101 (1986)). To accomplish its ends, MAPA protects both an artist's "Right of Integrity," an artist's right not to have his or her creations altered, and an artist's "Right of Paternity," an artist's right to claim or disclaim authorship of a work of art. *Id.* at 508. MAPA is modeled on the California Art Preservation Act, Cal. Civ.Code § 987, enacted in 1979. *Id.*

### b. *The Park*

■ Defendant argues that the Park does not meet the definition of a work of "fine art." The definition of "fine art" in MAPA is significantly more expansive than the definition of "work of visual art" in VARA because it is not limited to the specific enumerated types of art (i.e., sculpture) and expressly includes art forms not covered by VARA, like audiotapes, videotapes, holograms, and films. Given the elasticity of the definition of "fine art," the Court concludes that a "park" can be a work of "visual art" under the statute.

■ However, Plaintiff has not demonstrated a likelihood of success in showing that the Park itself (as opposed to the sculptures in the Park) is of "recognized quality" as a work of "fine art." Plaintiff's experts testified primarily to the aesthetic merits of the sculptures within the Park and Phillips' reputation as an artist. Although Mr. Halvorson is a renowned landscape architect, and two experts (Barreto, Driscoll) believe the park design has meritorious quality, there is only conclusory evidence as to whether the quality of the Park design itself has been "recognized" by a cross-section of the artistic community or by artistic experts in the field. *Cf. Martin,* 192 F.3d at 612 (setting forth two-

---

**3.** A search of the State Library of Massachusetts revealed no relevant legislative history except prior versions of the bill.

tiered test for "recognized stature" under VARA).

### c. *Site–Specificity*

▮ Again, the predominant issue is whether the Massachusetts statute protects the placement of site-specific art. The analysis starts with the statutory language. *Richardson v. United States,* 526 U.S. 813, 818, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999). MAPA defines fine art to include any "original work of visual or graphic art of any media." § 85S(b). One dictionary definition of "medium" is "the material or technique with which an artist works." *Random House* at 843. Under this definition, the question then becomes whether the location can be the medium with which the artist works.

The undisputed expert testimony is that in site-specific sculpture, the artist incorporates the environment as one of the media with which he works. I find that Phillips' sculpture has a marine theme that integrates the large granite stones of the Park with his sculptures and the granite sea walls of Boston Harbor into one interrelated visual work of art. Therefore, Phillips used the harborside location at Eastport Park as one medium of his art. To move Phillips' integrated work of visual art (i.e., the sculptures, boulders, and granite paths along the axis, which I described in the VARA discussion) to another location (particularly a non-marine one) would be to alter it physically.

Unlike VARA, MAPA contains no provision like the "public presentation" exclusion, which exempts modifications from a change in placement from its protections. The statute does provide diminished protection for works of art that cannot be removed from a building without damaging the works, Mass. Gen. Laws Ann. ch. 231, § 85S(h)(1), but it does not preclude protection of art that cannot be removed from real estate without physical alteration. *See* Koven, 71 Mass. L.Rev. at 108, n. 51 (noting that "the statute actually only speaks to artwork attached to the building itself, thus leaving out of these special provisions artwork on the grounds but free-standing"). In contrast, the California Art Preservation Act, which is described as the model for MAPA, provides: "If a work of fine art cannot be removed from real property without substantial physical defacement, mutilation, alteration, or destruction of such work, no action to preserve the integrity of the work of fine art may be brought under this section." [4] Cal. Civ.Code § 989(e). The failure to provide a parallel provision is a strong indication of legislative intent. *See Moakley,* 666 N.E.2d at 510 (interpreting failure of MAPA to provide for retrospectivity, as was done by statutes in California and other jurisdictions, as one indicator of legislative intent).

Given the broad definitions of "fine art" in the statute, the undisputed expert testimony that for site-specific art, the location of a piece is a constituent element of the art, and the absence of a "public presentation" exclusion in MAPA, the Plaintiff has a reasonable likelihood of success on this issue of first impression. Thus, I find that the environment of Phillips' integrated sculpture along the axis of the Park is a critical element of those works, and changing the location of the sculpture constitutes an alteration under § 85S(b) and § 85S(c).

---

**4.** It should also be noted that a separate California statute, intended to encourage art in public buildings, explicitly excludes "environmental landscaping placed about a state building" from its broad definition of "work of art." West's Ann. Cal. Gov.Code § 15813.1 (2003); *Botello v. Shell Oil Co.,* 229 Cal.App.3d 1130, 1137, 280 Cal.Rptr. 535 (Cal.Ct.App.1991) (noting apparent intent of statute).

#### d. *Recognized Quality*

Defendant does not dispute that the work of visual art is of recognized quality. Plaintiff submits affidavits from Professor Driscoll and Professor Ranalli, and the testimony of Mr. Barreto. In addition, Plaintiff has submitted various articles about the artwork: *Pembroke Real Estate and the Drew Company Hold Grand Opening of World Trade Center East on South Boston Waterfront,* High Profile Monthly, October–November 2000, at 32 (Ex. 17) (describing Eastport Park as a "sculpture Park featuring permanent exhibits by renowned artists"); Cambridge Arts Council, *David Phillips: Quincy Square,* at www.cambridge-ma.gov/~CAC/public_art_tour/map_05_06.html (accessed by party on September 5, 2003) (Ex. 11) ("David Phillips is well known for his public sculpture and collaborating with landscape architects"); Linda Goodspeed, *Artwork Finds a Place to Thrive in the Seaport Area,* Boston Bus. J., Oct. 13–19, 2000 (page unavailable). I find that Plaintiff has established a likelihood of success in proving that his sculptures are of "recognized quality."

#### 3. *First Amendment*

Defendant makes an interesting but scantily-briefed claim that were this Court to find that Defendant must keep Phillips' artwork on its property, such action would violate Defendant's First Amendment right to be free from compelled artistic expression.

Plaintiff makes the equally intriguing argument that Defendant has undertaken a traditionally public function in the management of a public park, and therefore has become a state actor to which constitutional standards should be applied. *See Evans v. Newton,* 382 U.S. 296, 302, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) ("Under the circumstances of this case, we cannot but conclude that the public character of this park requires that it be treated as a public institution subject to the command of the Fourteenth Amendment, regardless of who now has title under state law."). Phillips claims that his artistic expression is entitled to protection under the First Amendment. *Piarowski v. Illinois Community College District,* 759 F.2d 625, 628 (7th Cir.1985) (holding that the First Amendment embraces purely artistic as well as political expression). Notably, in *Serra,* which was decided before the enactment of VARA, the Second Circuit held that an artist has only limited First Amendment rights to artistic expression *after* he has sold his art to the government and that removal of sculpture is a permissible time, place and manner restriction even when it is motivated by artistic reasons so long as the motivation is not content-based. 847 F.2d at 1048–51.

Whose artistic vision does the First Amendment protect? In light of my ruling that MAPA protects site-specific sculpture from physical alteration by removal, I address only Defendant's constitutional claim. Defendant relies on *Hurley v. Irish–American Gay, Lesbian & Bisexual Group of Boston,* 515 U.S. 557, 574–75, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), a case involving the rights of a parade not to include certain groups, and *Wooley v. Maynard,* 430 U.S. 705, 713, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), a case involving a person's right not to display a state motto on his license plate, for the proposition that the First Amendment protects the right to be free from compelled expression.

Defendant's First Amendment claim fails for four reasons. First, Defendant, a highly sophisticated real estate development firm, agreed to place Plaintiff's sculpture in a public park and did not

obtain a written waiver of MAPA rights—as it easily could have done under the law. Therefore, this was not compelled, but invited artistic expression. *See PruneYard Shopping Center v. Robins,* 447 U.S. 74, 85–88, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) (rejecting a forced association claim by a shopping center into which the public was invited).

Second, Defendant has a diminished claim to First Amendment protection because it agreed to manage a public park and it voluntarily agreed that it would not alter the site without the permission of numerous government agencies, including Massport and the BRA. An owner of purely private property would have a stronger First Amendment interest in his own artistic expression—and the right to change his mind about artistic merit after purchasing art.

■ Third, Defendant has a right to regulate the time, place and manner of artistic expression in its park so long as its regulation is not content-based. Here, though, there is persuasive evidence that Defendant intended to eliminate Plaintiff's artwork because he exercised his First Amendment rights in bringing this action. *See Serra,* 847 F.2d at 1049–51 (noting right of government to place time, manner, and place restrictions on display of artwork); *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 284, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (noting that even though teacher could have been discharged "for no reason whatsoever," teacher could establish right to reinstatement if discharge occurred because of exercise of constitutionally-protected First Amendment rights); *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 513, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (noting that First Amendment protects right of access to the courts).

Fourth, even if MAPA burdens protected speech, it serves a compelling state interest. *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 786, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). MAPA states in its preamble that there is "a public interest in preserving the integrity of cultural and artistic creations." Mass. Gen. Laws Ann. ch. 231, § 85S(a). The legislative history to VARA indicates that the *droit morale* are also necessary to encourage artists in their arduous and often financially-unremunerative work by recognizing its special contribution to society. H.R. Rep. 101–514, at 2. MAPA is narrowly tailored in that parties can easily opt-out of its provisions through a contractual waiver. There has been no argument by Pembroke that MAPA is not a narrowly tailored means of serving this compelling state interest.

### C. *Irreparable Injury*

■ Phillips has demonstrated that he would suffer irreparable injury to his reputation if the construction proceeds. It is true that Mr. Shaughnessy—the skilled mover of the Tyrannosaurus Rex and the "Quest for Immortality: Treasures of Ancient Egypt" exhibit at the Boston Museum of Science—could store the art piece somewhere in South Boston without injuring it. However, the loss of Mr. Phillips' reputation is not quantifiable. "[I]f the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 19 (1st Cir.1996).

### D. *Balance of Hardships*

■ At the outset of this litigation, Defendant stated that if it were not able to begin construction in the fall so that it could complete the renovations of the Park in spring 2004, it would have to pay an

additional $120,000 in construction costs. Subsequent to that time, Defendant changed its plans for the Park, because of Plaintiff's assertion of his rights under VARA and MAPA. Pembroke's last-minute about-face required new approvals from the BRA and Massport and caused much of the delay in the court proceedings. The Court permitted the plantings and other Park modifications that did not affect Plaintiff's sculptures (i.e., the destruction of the pergola). No evidence has been presented as to any substantial costs that would result from delaying the remaining construction until next spring. The balance of hardships weighs in the Plaintiff's favor.

### E. *Public Interest*

Massachusetts noted in MAPA that there is "a public interest in preserving the integrity of cultural and artistic creations." Mass. Gen. Laws Ann. ch. 231, § 85S(a). This factor is not disputed by the Defendant.

### III. BOND REQUIREMENT

Defendant has requested that Plaintiff be required to post a bond in this case, a request the Court considers reasonable. Phillips shall pay a bond of $5,000.00.

### *ORDER*

Defendant shall not alter, destroy, move or remove any of the sculptures along the northeast—southwest axis of the Park until the conclusion of this litigation or further order of the Court. With respect to the other sculptures, Defendant may move the sculptures but shall not destroy or alter them.