## DAVID PHILLIPS *vs.* PEMBROKE REAL ESTATE, INC.

Suffolk. September 7, 2004. - December 21, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Art Preservation Act. Statute,* Construction. *Words,* "Site-specific art."

This court, in determining the extent to which the Massachusetts Art Preserva-
tion Act, G. L. c. 231, § 85S (MAPA), protected the placement of "site-
specific" art (i.e., art that is conceived and created in relation to the
particular conditions of a specific site), concluded, based on the language
of the statute as a whole and the Legislature's intentions in its enactment,
that MAPA, although prohibiting the physical destruction of the crafted
components of such art, does not protect it against the conceptual destruc-
tion or decontextualization that results from the removal of those
components from the physical environment in which they have been placed;
therefore, in circumstances in which the crafted components of certain site-
specific art could be extracted from their surroundings without physical
damage to them, their removal did not violate MAPA. [114-121]

CERTIFICATION of a question of law to the Supreme Judicial Court by the United States District Court for the District of Massachusetts.

*Scott P. Lewis (Thane D. Scott* with him) for the defendant.

*Andrew D. Epstein (Lucy D. Lovrien* with him) for the plaintiff.

The following submitted briefs for amici curiae:

*Ben Robbins* for New England Legal Foundation.

*Martin R. Healy, Christopher D. Moore,* and *Dahlia S. Fetouh* for National Association of Industrial and Office Properties.

*Daniel H. Weiner & Francesca K. Garson,* of New York, for Volunteer Lawyers for the Arts of Massachusetts & another.

CORDY, J. There appearing to be no controlling precedent in the decisions of the Supreme Judicial Court, a judge of the

United States District Court for the District of Massachusetts certified the following question for our consideration:[1]

"Under the facts and circumstances described in the District Court's October 24, 2003 Memorandum and Order, to what extent does the Massachusetts Art Preservation Act, Mass. Gen. Laws ch. 231, § 85S (1984), protect the placement of 'site specific' art?"

The term "site-specific" art does not appear in any applicable Massachusetts statute. It is a term that has been defined in the art world as art "[that] is conceived and created in relation to the particular conditions of a specific site." *Serra* v. *United States Gen. Servs. Admin.*, 847 F.2d 1045, 1047 (2d Cir. 1988) (quoting sculptor Richard Serra). It has also been described as "a combination of readymade work and a crafted work: the site is the readymade work, from which the artist draws her inspiration, and upon which the artist adds a crafted material. Together, the readymade and the crafted material exist as the artwork." Garson, Before That Artist Came Along, It Was Just a Bridge: The Visual Artists Rights Act and the Removal of Site-Specific Artwork, 11 Cornell J.L. & Pub. Pol'y 203, 230 (2001). The term "site-specific" is also admittedly a "sort of catchall phrase for a variety of artworks that elevate, in varying degrees, the importance of the relationship between context and object." *Id.* at 233. In some works of site-specific art, the landscape provides the context necessary to give full meaning to otherwise freestanding crafted objects. In other works, such as "earthworks,"[2] the artwork is "completely inextricable from [its] site[] because

---

[1]The certification was made pursuant to S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981), which, in relevant part, provides: "This court may answer questions of law certified to it by . . . a United States District Court . . . when requested by the certifying court if there are involved in any proceeding before it questions of law of this State which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of this court."

[2]Many artists have experimented with materials such as rocks and mud, using them to create large-scale works of art. For example, Robert Smithson's "Spiral Jetty" of 1970, which is located on the Great Salt Lake in Utah, is a coil 1,500 feet long and fifteen feet wide composed of black basalt rocks and earth from the site. The work is only visible when the lake's water level is

[it is] literally made from and imbedded in nature." *Id.* at 234. The facts of this case present the former and not the latter type of site-specific art.

After considering all the language used in the Massachusetts Art Preservation Act, G. L. c. 231, § 85S (MAPA), construed as a whole, consistent with what we can glean of the Legislature's intentions in its enactment, we answer the question as follows: MAPA does not protect the placement of the type of site-specific art at issue here. Although it prohibits the physical destruction of the crafted components of such art, MAPA does not protect it against the conceptual destruction or decontextualization that may result from the removal of those components from the physical environment in which they have been placed. If the crafted components of site-specific art can be extracted from their surroundings without physical damage to them, the statute is not violated by their removal.[3]

1. *Background.* The relevant background is contained in the memorandum and order of the District Court judge. See S.J.C. Rule 1:03, § 3 (2); *Phillips* v. *Pembroke Real Estate, Inc.*, 288 F. Supp. 2d 89 (D. Mass. 2003). We summarize only those facts that inform our resolution of the certified question.

David Phillips is a sculptor who has gained national recognition for his site-specific artwork. In 1999, Pembroke Real Estate, Inc. (Pembroke), commissioned Phillips to work on Eastport Park (park), a public green space in the South Boston waterfront section of Boston.[4] The commission resulted in two contracts between the parties: the "Eastport Park Artwork Agreement" (agreement I) and the "Eastport Park Stonework Agreement" (agreement II). Pursuant to agreement I, Phillips created ap-

---

low. See Govan, Art as Information, 19 Cardozo Arts & Ent. L.J. 109, 115-116 & n.29 (2001).

[3]We do not consider or decide how the Massachusetts Art Preservation Act, G. L. c. 231, § 85S (MAPA), would affect the placement of the crafted pieces of site-specific art in the event of their relocation to another site for public display.

[4]Pembroke Real Estate, Inc. (Pembroke), is a private real estate developer that leases the Eastport Park (park) land from the Massachusetts Port Authority (Massport). Massport and the Boston Redevelopment Authority have final approval over any changes to the design of the park.

proximately twenty-seven sculptures for the park, including abstract bronze and granite works and a dozen realistic bronze sculptures of hermit crabs, shrimp, and frogs. Under agreement II, Phillips was responsible for the design and installation of rough stone walls, split granite paving stones, and other landscape design elements.[5] Most of Phillips's sculpture and landscape elements are organized along a diagonal sight line, or axis, passing through the park, and are unified by a theme of spiral and circular forms. At the center of the axis is a large spherical sculpture entitled "Chords."

Soon after the park was completed in the spring of 2000, Pembroke determined that it was in need of alteration. A redesign scheme was prepared by British landscape architect Elizabeth Banks. It called for the removal and relocation of Phillips's sculptures. Phillips protested and, in January, 2003, Pembroke agreed to retain all but one of Phillips's sculptures.[6] Phillips objected to Pembroke's revised plan and subsequently filed suit in the United States District Court for the District of Massachusetts, seeking injunctive relief under the Federal Visual Artists Rights Act of 1990, 17 U.S.C. § 106A (2000) (VARA), and MAPA.

On August 21, 2003, at the conclusion of a nonevidentiary hearing, the United States District Court judge issued a temporary restraining order enjoining Pembroke from altering the park. Subsequently, Pembroke announced its intention to return to the original redesign scheme, which called for the removal of all of Phillips's sculptures. After a two-day evidentiary hearing, the United States District Court judge issued a memorandum and order in which she found "that the environment of Phillips' integrated sculpture along the axis of the Park is a critical element of those works, and changing the location

[5]The master plan for the park was prepared by noted landscape architect Craig Halvorson. In addition to the work of David Phillips and Halvorson, the park also features bronze benches designed by Judy McKie and large-scale kinetic sculptures designed by Susumu Shingu.

[6]Specifically, the January, 2003, redesign scheme called for the removal of a bronze plaque designed by Phillips for one of the Park's walkways and for the relocation of a corner sculpture. In addition, changes to Phillips's stone walkways, pavers, and steps were proposed.

of the sculpture constitutes an alteration" under MAPA. Accordingly, she ordered that Pembroke "not alter, destroy, move or remove any of the sculptures along the northeast-southwest axis of the Park until the conclusion of this litigation or further order of the Court. With respect to the other sculptures, Defendant may move the sculptures but shall not destroy or alter them."

Both parties filed interlocutory appeals with the United States Court of Appeals for the First Circuit pursuant to 28 U.S.C. § 1292(a)(1) (2000). In the interim, the District Court judge certified the present question, and the appeals have been stayed pending its resolution.[7]

2. *Discussion.* The question before us is one of statutory construction. "The general and familiar rule is that a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Industrial Fin. Corp.* v. *State Tax Comm'n*, 367 Mass. 360, 364 (1975), quoting *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934).

In a previous consideration of MAPA, we discussed its purpose and its relation to existing law. *Moakley* v. *Eastwick*, 423 Mass. 52 (1996). MAPA followed the lead of similar legislation in California and New York "in attempting to graft onto a generally inhospitable common law tradition the civil law concept of *droit moral*, whereby a creative artist retains certain inalienable rights with respect to his or her creation before and after publication, display or sale." *Id.* at 55, quoting Koven, Observations on the Massachusetts Art Preservation Act, 71 Mass. L. Rev. 101, 101 (1986). To accomplish its ends, MAPA protects both an artist's "right of integrity" (an artist's right not to have his or her creations altered), and an artist's "right of

---

[7]Both parties also argued claims under the First Amendment to the United States Constitution in Federal court, which are not before us. We answer only the certified question. See *Woodward* v. *Commissioner of Social Sec.*, 435 Mass. 536, 538 (2002); *Canal Elec. Co.* v. *Westinghouse Elec. Corp.*, 406 Mass. 369, 370 n.1 (1990).

paternity" (an artist's right to claim or disclaim authorship of a work of art). *Id.* at 56. The rights of integrity and paternity continue for fifty years after the artist's death and are enforceable by the artist or by his duly authorized representative by an action in the Superior Court. G. L. c. 231, § 85S (*g*).

In its preamble, MAPA contains the following legislative findings:

> "[T]he physical alteration or destruction of fine art, which is an expression of the artist's personality, is detrimental to the artist's reputation, and artists therefore have an interest in protecting their works of fine art against such alteration or destruction; and that there is also a public interest in preserving the integrity of cultural and artistic creations."

G. L. c. 231, § 85S (*a*). The statute goes on to define "[f]ine art" as "any original work of visual or graphic art of any media which shall include, but not limited to, any painting, print, drawing, sculpture, craft object, photograph, audio or video tape, film, hologram, or any combination thereof, of recognized quality."[8] *Id.* at § 85S (*b*). It then provides that:

> "No person, except an artist who owns or possesses a work of fine art which the artist has created, shall intentionally commit, or authorize the intentional commission of any physical defacement, mutilation, alteration, or destruction of a work of fine art."

*Id.* at § 85S (*c*). MAPA deals separately with "fine art" that has been attached to buildings, the significance of which is discussed later in this opinion. G. L. c. 231, § 85S (*h*).

In answering the certified question, we consider whether the Legislature intended to include the type of site-specific art at issue here within the statutory definition of "fine art," and whether MAPA's prohibitions against "any physical deface-

---

[8]"In determining whether a work of fine art is of recognized quality, the court shall rely on the opinions of artist[s], art dealers, collectors of fine art, curators of art museums, restorers and conservators of fine art and other persons involved with the creation or marketing of fine art." G. L. c. 231, § 85S (*f*).

ment, mutilation, alteration, or destruction of a work of fine art" extend to the type of "conceptual destruction" that might result from the removal of the crafted components of such art from the site on which they have been placed.

There is a "community of respected American artists and art authorities [that] regard the crafted work and the site of site-specific artworks as an indivisible whole." Garson, *supra* at 239. In the proceedings before the United States District Court, there was credible expert testimony to the effect that site specificity has become the "rallying cry" of public artists and public art administrators. There was also testimony that this "radical redefinition" of sculpture is a relatively recent trend in the history of art.

Our responsibility in this case is not to decide whether the environment or physical setting of site-specific art is an integral element of it, but to determine what the Legislature intended in 1984 when it enacted MAPA, St. 1984, c. 488, § 1, with no clear reference to such art. In making this determination, we write on a clean slate. No State or Federal appellate court has had occasion to decide whether removing such a work from its site constitutes a violation of the artist's right of integrity as protected under statutes similar to MAPA.[9]

In looking to the words of the statute, it is apparent that whether site-specific art comes within MAPA's protection depends on whether the Legislature intended the words "of any media" (used in the definition of "[f]ine art") to mean not only physical materials and techniques used by the artist to craft an object (such as bronze or granite, sculpture or painting), but also the "readymade" physical setting or environment that may have inspired the crafting of the object, and where it has been

---

[9]The Visual Artists Rights Act of 1990, 17 U.S.C. § 106A (2000) (VARA), the Federal analogue to MAPA, was enacted in 1990. Under § 106A(a)(3)(A) of VARA, "the author of a work of visual art" has the right "to prevent any intentional distortion, mutilation, or other modification of that work." One Federal trial court has interpreted VARA to exclude from its protection site-specific art, stating that the purpose of the statute "is not . . . to preserve a work of visual art *where* it is, but rather the preserve the work *as* it is." Managers of Soho Int'l Arts Condominium *vs.* City of N.Y., U.S. Dist. Ct. No. 01 Civ. 1226 DAB (S.D.N.Y. June 17, 2003). No State appellate court has rendered a decision on this subject.

placed. Webster's Dictionary defines "medium" in the context of visual and graphic art as "the material or technical means for artistic expression (as paint and canvas, lithographic or sculptural stone, or literary or musical form)." Webster's Third New Int'l Dictionary 1403 (1993). The American Heritage Dictionary defines it as a "specific type of artistic technique or means of expression as determined by the materials used or the creative methods involved." American Heritage Dictionary 815 (1981). Phillips's contention that the site can be the "medium" of such art would require an expansive reading of the term. Where the dictionary definitions are not conclusive on the issue of legislative intent we look to other provisions of the statute for indicia of such intent, and for the purpose of interpreting the statute as a consistent whole.

It is apparent that in drafting the statute, the Legislature was concerned not only with creating new rights for artists, but also with protecting the rights of property owners who commission artworks that become attached to real property. This concern manifests itself in the way § 85S (h) of MAPA addresses "fine art" attached to buildings. If the art can be removed from the building without causing "substantial harm" to the art, the building owner may remove the art after giving the artist notice and ninety days to reclaim and remove it himself (at his own expense). G. L. c. 231, § 85S (h) (2). If the artwork cannot be removed from the building without causing the "substantial physical defacement, mutilation, alteration, or destruction" of the art, the owner may proceed to remove it unless the artist has expressly reserved his rights under the statute "by an instrument in writing signed by the owner of such building and properly recorded, *prior* to the installation of such art" (emphasis added). G. L. c. 231, § 85S (h) (1).

This provision serves two purposes. First, it ensures that the owner of a building will be able to remove unwanted art from his property even if the removal would cause physical damage to the art in ways otherwise prohibited by MAPA (unless the property owner has signed a written instrument reserving the artist's rights). Thus, it "prevent[s] the artist from holding the building hostage to the artworks." Ginsburg, Copyright in the

101st Congress: Commentary on the Visual Artists Rights Act and the Architectural Works Copyright Protection Act of 1990, 14 Colum.-VLA J.L. & Arts 477, 486 (1990) (commenting on § 113[d] of VARA). Second, by requiring that any enforceable reservation of rights be "properly recorded," the statute protects the integrity of the real property conveyancing system and guards against the establishment of unnoticed, undetectable, and indeterminate encumbrances.[10]

If the Legislature intended to include the type of site-specific art at issue here within MAPA's protections, it would entail a radical consequence for owners of land, that the Legislature directly averted for owners of buildings. Specifically, rights afforded artists would encumber private and public land with restrictions lasting for the life of the artist plus fifty years, without the need for such restrictions to be recorded in a registry of deeds. We do not lightly read such an intent into a legislative act given the recognized legislative policy of discouraging land restrictions[11] (especially unrecorded ones), the common-law doctrine disapproving the long-term burdening of property, and the corollary judicial practice of construing statutory provisions regarding land restrictions "in favor of freedom of alienation." *Stop & Shop Supermarket Co.* v. *Urstadt Biddle Props., Inc.*, 433 Mass. 285, 290 (2001), quoting *Ward* v. *Prudential Ins. Co.*, 299 Mass. 559, 565 (1938). See *Bowen* v. *Campbell*, 344 Mass. 24, 26 (1962), quoting Restatement of Property § 418 ("if upon 'one of two or more possible constructions there is no restraint, such construction is preferred' "). We construe the statute consistent with these principles unless there is evidence of unambiguous legislative intent to place restrictions on the

---

[10]When the Legislature required the reservations of rights to be "properly recorded" and anticipated that, when recorded, they "shall be binding on subsequent owners," the lawmakers were contemplating that these instruments would be recorded in the registries of deeds. See Koven, Observations on the Massachusetts Art Preservation Act, 71 Mass. L. Rev. 101, 108 (1986).

[11]See, e.g., G. L. c. 184, § 21 (creating duty of grantor to inform grantee of encumbrances), § 23 (creating term limitation on conditions affecting use of real property), and §§ 26-30 (creating term limitations on land use restrictions).

physical environment in which the crafted components of site-specific art have been situated.[12]

We do not infer such legislative intent from the absence of language extending the protections afforded building owners under § 85S (h) of MAPA to property owners who might otherwise be unable to remove site-specific art from their land. The reasons why the Legislature might treat buildings differently from other real property with respect to the potential encumbering effect of the statute are not apparent, and we perceive none. The failure of the statute to address specifically the removal of fine art from land suggests that the Legislature either did not intend the statute's protection to extend to the land upon which works of art have been placed, or did not perceive the removal of free-standing works of art from their sites as causing their "physical defacement, mutilation, alteration, or destruction." Either way, there was no need for it to consider the possibility that land might be also "held hostage" to attached artworks. Given the Legislature's evident concern that works of fine art not burden buildings, and that restrictions encumbering buildings be properly recorded, it is apparent to us that if the Legislature had understood that MAPA would have that same encumbering effect on the sites of site-specific art, it would have addressed the subject directly.

In light of these provisions, we think it more likely that the Legislature intended the word "media" to refer to the various materials (e.g., paint, charcoal, and film) and techniques (e.g., painting, drawing, and photography) that an artist manipulates to create a work of fine art, rather than the materials (in this case, the site) and techniques (in this case, site specificity) that inspire an artist. This is consistent with the list of examples enumerated by the Legislature in MAPA itself ("painting, print, drawing, sculpture, craft object, photograph, audio or video tape, film, hologram, or any combination thereof"). While the

---

[12]Moreover, statutes like MAPA that alter common-law property rights and impose new obligations totally unknown at common law are ordinarily construed strictly, Corcoran v. S.S. Kresge Co., 313 Mass. 299, 303 (1943), unless the obvious legislative purpose behind the statute would be defeated by doing so.

Legislature's inclusion in MAPA of the words "shall include, but not [be] limited to" indicates that the specific examples of "visual or graphic art of any media" do not represent an exhaustive list of protected works, we may look to them for guidance in determining the Legislature's intent, particularly where there is ambiguity in the meaning of the operative word — "media." *Commonwealth* v. *Baker*, 368 Mass. 58, 68 (1975) ("In the absence of specific precedent on the meaning of a word or phrase in a statute, we are guided by accepted principles of construction. One such principle leads us to relate the words in question to the associated words and phrases in the statutory context").

This interpretation is also consistent with our view that the statutory protection afforded fine art is protection from physical rather than conceptual harm. Section 85S (*c*) prohibits "any physical defacement, mutilation, alteration, or destruction" of fine art. Phillips maintains that the word "physical" only modifies the word "defacement" and urges this court to adopt broad, metaphysical definitions of the terms "alteration" and "destruction." However, such an interpretation is belied if subsection (*c*) is read in conjunction with subsection (*a*), which articulates the purpose of the act and declares that "the physical alteration or destruction of fine art . . . is detrimental to the artist's reputation." See *Beeler* v. *Downey*, 387 Mass. 609, 617 (1982) (instructing that words used in one part of statute in definite sense should be given same meaning in another part of statute). The use of the term "physical" in this section compels the construction of the term "physical" in subsection (*c*) to modify all of the words that follow it, including "defacement, mutilation, alteration, [and] destruction." In application, moving Phillips's sculptures will not result in their physical destruction, nor will it cause a physical alteration to the actual sculptures. The harm presented is decontextualization. That this harm is significant to Phillips (and possibly to the public) is not to be understated, but it is not the same harm as the actual physical alteration or physical destruction of the artworks crafted by the artist. The balance struck by the Legislature in 1984 deals only with the latter.

Finally, we are not persuaded that the differing language in VARA and the California Art Preservation Act (CAPA), Cal. Civ. Code § 987 (West 1982 & Supp. 2000), on which MAPA is based, requires a different result.[13]

---

[13]The District Court judge noted that VARA, unlike MAPA, contains a "public presentation" exception, which provides that "[t]he modification of a work of visual art which is the result of . . . the public presentation, including lighting and placement, of the work is not a destruction, distortion, mutilation, or other modification" under § 106A. 17 U.S.C. § 106A(c)(2). In light of the fact that MAPA was passed some six years prior to the enactment of VARA, we are not persuaded that the omission of similar language in MAPA indicates that the Legislature intended to protect the placement and presentation of works of fine art. See 2B N.J. Singer, Sutherland Statutory Construction § 51.06, at 266-267 (6th ed. rev. 2000) ("a state legislature cannot be presumed to know what legislation Congress will pass and the intent of Congress affords no basis for determining the intent of the state legislature"). Nor are we persuaded that the Legislature's failure to provide a provision similar to Cal. Civ. Code § 989(e) (West 1982 & Supp. 2000), which states that "[i]f a work of fine art cannot be removed from real property without substantial physical defacement, mutilation, alteration, or destruction of such work, no action to preserve the integrity of the work of fine art may be brought," indicates that the Legislature intended to protect the rights of artists whose work cannot be removed from land without physical alteration. Section 989 of the California Civil Code confers rights to certain public interest organizations. Cal. Civ. Code § 989(b)(2), (c) (defining "[o]rganization" as a "public or private not-for-profit entity or association, in existence at least three years at the time an action is filed . . . a major purpose of which is to stage, display, or otherwise present works of art to the public or to promote the interests of the arts or artists"). It was enacted after CAPA, Cal. Civ. Code § 987 (West 1982 & Supp. 2000), and has been interpreted as a reaction to the limits of CAPA, which did not acknowledge "a public interest in preserving cultural and artistic works independent of the interest of the artist." Note, The "Recognized Stature" Standard in the Visual Artists Rights Act, 68 Fordham L. Rev. 1935, 1943-1944 (2000). There is no evidence that in passing § 989, however, the California Legislature intended to alter the scope of the rights conferred to artists and public interest organizations.