# United States Court of Appeals
## For the First Circuit

No. 05-1753

JAMES J. PALMIERI,

Plaintiff, Appellant,

v.

NYNEX LONG DISTANCE CO.,
d/b/a VERIZON ENTERPRISE SOLUTIONS,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Torruella, Circuit Judge,
Coffin, Senior Circuit Judge,
and Howard, Circuit Judge.

Robert W. Kline, with whom Kline Law Offices was on brief, for appellant.
Victoria Woodin Chavey, with whom Robert C. McNamee, Douglas W. Bartinik, and Day Berry & Howard LLP were on brief, for appellee.

February 6, 2006

**TORRUELLA, Circuit Judge**. Plaintiff-appellant James J. Palmieri ("Palmieri") brought suit against his former employer, defendant-appellee Nynex Long Distance Co. d/b/a Verizon Enterprise Solutions ("Verizon"), claiming that he was eligible for overtime pay for his work at the company. The district court granted summary judgment for Verizon, and Palmieri here contests this decision. After careful consideration, we affirm.

## I. Facts

For nearly fifteen years, Palmieri worked for Verizon, a large telecommunications vendor, and its corporate predecessors. During his time at the company, he rose through the ranks and in 1997 attained the position of "Account Manager," later renamed "Corporate Account Manager 3" ("CAM 3"). This is one of the highest level sales positions at Verizon. Palmieri held this position until his employment was terminated in August 2002.

As a CAM 3 working out of Verizon's office in Portland, Maine, Palmieri sold products and services associated with high-speed voice and data networks. He was expected to deal only with a limited number of large customers. In particular, he was assigned a module of 20 to 50 large customer accounts. He was not permitted to call on customers who were not within his assigned module. This meant that he needed to make repeat sales to the same customers in his module.

To accomplish this, he had quarterly meetings, or "planning sessions," with his customers. In these meetings, the customers would state their general needs and goals, and Palmieri would attempt to sell solutions to satisfy them. Palmieri also entertained the customers in his module by taking them to lunch or dinner, to Red Sox games, or to shows at the Wang Theater in Boston. This was done so that Palmieri could maintain his relationships and position himself well to make repeat sales to the customers in his module.

To handle the difficulties associated with making sales to large, institutional customers, Verizon provided CAM 3s such as Palmieri with a great deal of institutional support. For example, the company maintained a multi-tiered account team to address customer-service issues. This team provided technical and administrative support, so that the CAM 3s could focus their efforts on sales.

Verizon also gave Palmieri and other CAM 3s tremendous freedom in their daily routines. Palmieri, for example, was responsible for all parts of the sales transactions, including face-to-face client meetings, contract negotiations, and the signing of sales contracts. He and other CAM 3s also were permitted to set their own schedules based on their customers. When asked about his schedule, Palmieri testified as follows:

> I approached my job as an entrepreneur. This
> was my business, these were my customers, and

> I took full responsibility for that. And as such, I would put in the amount of time necessary to keep my customers happy as if they were my business.

Verizon's only substantive restriction on CAM 3s such as Palmieri was that they were required to visit with existing customers at least once per quarter.

For his efforts at Verizon, Palmieri was handsomely rewarded. Each year that he worked as a CAM 3, he earned a base salary that ranged between $55,000 and $65,000. In addition, he earned sales commissions. When his base salary and sales commissions were combined, he earned $101,515.28 in 1998, $95,127.67 in 1999, $103,361.09 in 2000, $77,022.27 in 2001, and $33,164.22 for the first five months of 2002.

In 1998, Verizon had merged with Bell Atlantic, another telecommunications company. As a result, a number of service and implementation positions at Verizon were eliminated. Palmieri thereafter received increased post-sale service implementation responsibilities. He was also assigned a number of accounts, originally sold by other CAM 3s, that had chronic service problems. Many of these accounts provided Palmieri with no sales opportunities, as the companies had already made it clear that they had no intention of making further purchases from Verizon. With these changes, Palmieri found that seventy percent of his daily activities related to customer service problems. Moreover, Palmieri was forced to remain in the office to deal with these

-4-

issues, as this was the only means by which he could receive calls from customers and make calls to Verizon's Network Operations Center, the company's nerve center for resolving service-related issues.

Palmieri was not happy with this turn of events and complained to his superiors that with this new emphasis on customer-service issues, he did not have enough time for sales. This had little effect, however. Furthermore, in 2002, Palmieri's sales quota was increased from $1 million to $5 million. This too displeased him, as he thought that such a quota could not possibly be met. After all, his module of accounts had never supported sales in excess of $1 million. The changes eventually became overwhelming for Palmieri, and in May 2002, he took a leave of absence from Verizon. In August 2002, he was fired.

Approximately two years later, on June 7, 2004, Palmieri filed this lawsuit in Maine state court. His complaint contained four counts. Count I sought unpaid overtime wages pursuant to the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207. Count II alleged a violation of the Maine Prompt Pay Act, Me. Rev. Stat. Ann. tit. 26, § 626. Count III sought unpaid overtime wages pursuant to Maine law, Me. Rev. Stat. Ann. tit. 26, §§ 664(3) and 670. Count IV, finally, alleged spoliation of evidence. On or about July 1, 2004, Verizon, pursuant to 28 U.S.C. § 1446, filed a

notice of removal to have the proceedings removed to the United States District Court for the District of Maine.

In federal court, the case was referred to United States Magistrate Judge David M. Cohen.  Following the close of discovery on January 18, 2005, Verizon moved for summary judgment on each of Palmieri's claims.  Palmieri opposed summary judgment only with respect to Count I (the FLSA claim) and Count III (the Maine overtime claim).

Judge Cohen, in a thorough and well-reasoned opinion, recommended that summary judgment be granted for Verizon on all claims.  The district court adopted this recommendation and on April 22, 2005 granted summary judgment for Verizon.  In this appeal, Palmieri contests only the district court's resolution of his claim for overtime pay under Maine law.

## II.  Discussion

We review the district court's entry of summary judgment de novo.  Cordero-Soto v. Island Fin., Inc., 418 F.3d 114, 118 (1st Cir. 2005).  "In conducting such review, we examine the summary judgment record in the light most friendly to the summary judgment loser, and we indulge all reasonable inferences in that party's favor."  National Amusements v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995).

Palmieri argues here that the district court incorrectly found that he was not entitled to overtime under Maine law.  In

-6-

evaluating this claim, we note that the key statutory provision is Me. Rev. Stat. Ann. tit. 26, § 663(3)(C), which states that "[e]mployees whose earnings are derived in whole or in part from sales commissions and whose hours and places of employment are not substantially controlled by the employer" are not entitled to overtime pay. Me. Rev. Stat. Ann. tit. 26, § 663(3)(C) (2005) (the so-called "sales commission" exemption).

There has never been any question in this case that Palmieri's earnings were derived, at least in part, from sales commissions. As discussed above, Palmieri received a base salary of $55,000 to $65,000 during the time he worked as a CAM 3, and his income was supplemented each year with the money that he earned through sales commissions. The district court found that Verizon paid Palmieri $101,515.28 in 1998, $95,127.67 in 1999, $103,361.09 in 2000, $77,022.27 in 2001, and $33,164.22 for the first five months of 2002. The difference between these figures and the base salary was the result of sales commissions that Palmieri had earned.

What is, and has been, at issue is whether Verizon substantially controlled the hours and places of Palmieri's employment. In the proceedings below, Palmieri, to support his claim that the company had indeed exerted substantial control over his hours and places of employment, pointed to how the nature of his job changed after Verizon's merger with Bell Atlantic in 1998.

Instead of working as he had as a sales representative responsible for selling new products and services to potential clients, he found that his primary function following the merger was ensuring that service was delivered to Verizon's customers. He asserts that by forcing him to handle additional service matters that required him to stay in the office, the company substantially controlled the hours and places of his employment.[1] As a result, he argues that he does not fall within the terms of the exemption and should have received overtime pay.[2]

The district court rejected this argument, noting that the Maine statute only raises the question of whether the employer substantially controlled the employee's hours and places of work. It did not raise the question of whether the employer adopted policies or made assignments that substantially influenced the

---

[1] As we already noted in our recitation of the facts, Palmieri had argued that staying in the office was the only means by which he could receive calls from customers and make calls to Verizon's Network Operations Center. We find it incredible that a company such as Verizon -- one that bases its entire business on high technology -- would fail to make use of that technology and permit its sales representatives to make the maximum use of their time by allowing them to field service inquiries while they were off-site attempting to make sales. Nevertheless, the district court found, in a finding of fact, that Palmieri was forced to remain in the office to deal efficiently with customer-service issues. Therefore, we accept Palmieri's contention as true for purposes of reviewing the district court's decision.

[2] We note that there is no allegation here that the employer imposed new duties that it knew would have the effect of controlling the employee's time, but avoided doing so expressly in order to evade the overtime law. The issues raised by such an allegation are entirely different, and we do not address them here.

manner in which the employee could conduct business (including hours and work locations). Given this difference, and given Palmieri's resulting failure to demonstrate that Verizon had, in fact, substantially controlled the hours and places of his employment, the district court held that Palmieri fell within the terms of the exemption and was not entitled to overtime pay.

In this appeal, Palmieri advances the same argument he made below and claims that the district court erred in finding that his hours and places of employment were not substantially controlled by his employer. For a number of reasons, we think that the district court made the correct decision.

First, we do not believe that there was any "substantial control" by Verizon. In addressing this issue, we first must consider the proper method of interpreting Me. Rev. Stat. Ann. tit. 26, § 663(3)(C), the Maine law at issue here. Verizon argues that we should look only at the plain text of the statute. Palmieri, however, believes that we should look beyond the plain text and explore the purposes behind the statutory provision by examining other sources of information such as legislative history and analogous federal statutes, regulations, and case law.[3]

We have consistently held that when the plain meaning of a statute is clear, we are not to look beyond that text to discern

---

[3] Both parties note that no court has yet interpreted Me. Rev. Stat. Ann. tit. 26, § 663(3)(C).

legislative intent. See, e.g., Bonilla v. Muebles J.J. Álvarez, Inc., 194 F.3d 275, 277 n.2 (1st Cir. 1999) (When "the plain meaning of the statute resolves the issue sub judice, we need not rummage through the legislative history or search for other interpretive aids."). In the instant case, however, there is a portion of the Maine statute that contains some ambiguity -- namely, the words "substantially controlled." To determine what the Maine legislature meant by such a phrase, we are willing to adopt the approach advocated by Palmieri. See United States v. Pub. Util. Comm'n of California, 345 U.S. 295, 315 (1953) ("Where the words [of a statute] are ambiguous, the judiciary may properly use the legislative history to reach a conclusion."); Gordon v. Maine Cent. R.R., 657 A.2d 785, 786 (Me. 1995) ("When . . . a term is not defined in either the relevant statutory provisions or in prior decisions of this court, Maine courts may look to analogous federal statutes, regulations, and case law for guidance.").

Looking first to the federal analogue of the Maine law, the federal Fair Labor Standards Act, 29 U.S.C. § 207, and in particular to the relevant exemption provision, 29 U.S.C. § 213 (a)(1), we see that employees categorized as exempt from the overtime provision of the FLSA include "any employee employed . . . in the capacity of an outside salesman (as such term is defined and delimited from time to time by regulations of the Secretary [of Labor]." 29 U.S.C. § 213(a)(1). Turning then to the regulations

in effect during the relevant time frame to determine what is meant by an "outside salesman," we learn that an "outside salesman" is characterized solely by the relative percentages of time that he spends on sales and other work.  See 29 C.F.R. § 541.5 (2002).  The degree of control by the employer is a non-factor in determining whether someone is exempt.  Therefore, the examination of similar federal legislation does little to help us determine the precise meaning of the Maine statute.[4]

The legislative history of the Maine statute itself is also of limited assistance.  Although Palmieri, in his reply brief, traces in detail the evolution of the language in the statute over the years, see Reply Brief of Appellant 5-6, his discussion does not shed light on what the Maine legislature might have meant by its use of the phrase "substantially controlled."

Thus, although we have adopted the approach to statutory interpretation advocated by Palmieri, we do not find it to be helpful.  We therefore find ourselves compelled to rely on the plain meaning of the statutory language to determine whether, in fact, Verizon "substantially controlled" the hours and places of Palmieri's employment.

---

[4]  The district court agreed, noting that "the substance of Maine's sales exemption differs significantly enough from that of its closest analogue (the federal outside-sales exemption [in 29 U.S.C. § 213(a)(1)] that federal regulations and caselaw are not helpful in construing it."

Maine's basic rules of statutory interpretation require that words in a statute be given "their plain, common, and ordinary meaning." Butterfield v. Norfolk & Dedham Mut. Fire Ins. Co., 860 A.2d 861, 862 (Me. 2004). "Control," the verb in the statute, means "to exercise restraining or directing influence over" or "to have power over." Merriam-Webster Online Dictionary, http://www.m-w.com. "Substantially," the adverb modifying "control," means "considerable in quantity" or "significantly great." Id.[5]

Using these definitions as a guide, we simply do not see how Verizon's oversight of Palmieri can be deemed "substantial control." This was not a case where Verizon told Palmieri that he had to be at his desk every day for a set number of hours in order

---

[5] We wish to emphasize the Maine legislature's use of the word "substantially." In his brief, Palmieri points to two other states, Washington and California, that incorporate the element of "control" in any determination of whether an employee is exempt from receiving overtime pay. As Verizon correctly points out, however, these statutes differ from the Maine statute at issue in this case. Although the Washington and California statutes mention "control," they do not contain the word "substantially" to modify "control." The Washington statute uses the phrase "no control," thus tightly restricting the applicability of the exemption. See Wash. Admin. Code 296-128-540 ("where . . . the employer has no control over the total number of hours worked"). The California provision contains no modifier whatsoever. See 8 Cal. Code Regs. § 11010(2)(G) ("subject to the control of their employer"). These differences are not without consequence. See Mertens v. Hewitt Assocs., 508 U.S. 248, 258 (1993) ("We will not read the statute to render the modifier superfluous."); United States v. Nordic Village, Inc., 503 U.S. 30, 36 (1992) (declining to adopt a construction that would violate the "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect").

to answer service-related calls from customers. Rather than being "substantially controlled," he was given substantial latitude to work as he saw fit. He saw himself as an "entrepreneur" and noted that he put in the amount of time necessary to keep customers happy. Furthermore, he admitted that Verizon placed few controls over his places of work. This hardly sounds to us like a person who has his hours and places of employment controlled by the employer, let alone "substantially" controlled.

To be sure, Verizon's decision to impose upon Palmieri additional service-related responsibilities may well have influenced the manner in which Palmieri could conduct business (including hours and work locations). It may have required him to come to the office more frequently to check if anyone called. If a customer did call with a problem, he would have to stay and deal with it. If, however, no one called, he could leave as he saw fit and work on sales. The point is that he was not required by his employer to sit at his desk every day and wait for customers to call. He had substantial freedom each day to structure his hours and places of employment. Although he may have had less freedom than before the Bell Atlantic merger to structure his day, he still was not under the substantial control of his employer. The district court was therefore correct in stating that although Palmieri's choices were impacted and circumscribed by Verizon's assignments, the company plainly cannot be said to have

substantially controlled his hours and places of work for purposes of § 663(3)(C).

What undergirds this holding is our belief that "substantially controlled" within the meaning of the statute requires more specific direction on hours and places of employment than was the case here. A contrary holding -- one in which we were to agree with Palmieri and find that Verizon in this instance did provide enough direction on hours and places of employment such that Palmieri had his hours and places of employment "substantially controlled" for the purposes of the statute -- could lead to unworkable situations in which temporary assignments of new tasks could move employees into and out of exempt status for brief periods of time. If "substantially controlled" covered more than what is explicitly required by the employer, claims could be made at any time that a special, temporary work assignment made it inconvenient or impossible for an employee to maintain the level of his usual commission-based workload and effectively, though not explicitly, required "attendance" during given days and hours. It seems to us that drawing lines based on percentages of "effective" control is wholly untenable. In the absence of any legislative insight, we believe that it makes sense to confine the reach of "substantially controlled" to those situations in which the employer actually articulates specified work hours and locations.

The second, and related, reason we believe the district court was correct is the ample record evidence that it was not the employer that was controlling Palmieri's "hours and places of employment" (as is required by the statute), but rather Palmieri himself who was in control. Although Palmieri spent a great deal of time on service-related issues, there are a number of indications that this emphasis was by choice. For example, the district court found that "Palmieri played an active role in service-related issues and was more deeply involved than other CAMs." If Palmieri was doing more in the customer-service arena than what was expected of CAM 3s, a jury would have to conclude that such "extra" work was by choice and was not imposed upon him by Verizon.

The court also found that "Palmieri tried to maintain his relationships with his customers by providing good service." This desire to "maintain relationships" was, without a doubt, tied to Palmieri's sales responsibilities and stemmed from the goal of making additional sales to customers and earning additional sales commissions. To counter the suggestion that he focused on service issues by choice because he had something to gain, Palmieri notes that providing good service would have had no effect on sales relationships in a number of his accounts (e.g., Public Service of New Hampshire, Desktek, and Laconia Savings Bank), because these companies had already made clear their intent not to purchase

-15-

additional products or services from Verizon.  Attention to such service-related accounts, he contends, was forced upon him by Verizon.

Palmieri's attempt to negate the significance of the time he allocated to customer service falls short, however, because even if there were a number of accounts where he had no sales prospects, he did have other accounts in which sales were possible and where his emphasis on service issues would have gone a long way toward helping him maintain these account relationships and earning additional sales commissions.  Thus, Palmieri's time spent on service-related issues does not mean that the company exerted control over him but was meaningful evidence of his own desire to maintain and even expand the accounts.

Third, we are persuaded by Palmieri's own characterization of the summary judgment calculus. Palmieri frames the issue posed by summary judgment as whether there was any prospect of sales.  But, by his own admission, he spent at least twenty percent of his time making sales, and a substantial portion of his income each year came from the commissions earned as a result of those sales.  Clearly, then, there was at least some prospect of Palmieri making sales.  Thus, there remained no genuine issue of material fact as to whether Palmieri had any prospect of making sales.

For these three reasons, we think that the district court was correct in holding that there was no triable issue as to the substantiality of Verizon's control over Palmieri's hours and places of employment, and that summary judgment on Palmieri's state law claim was proper. Since we uphold the district court's determination that Palmieri was not entitled to overtime pay under the "sales commission" exemption under Maine law, we need not reach Verizon's alternative argument that Palmieri is also exempt under Maine's so-called "administrative" exemption. See Me. Rev. Stat. Ann. tit. 26, § 663(3)(K) (2005).

### III. Conclusion

For the reasons set forth above, we affirm the order of the district court.

**Affirmed**.