# United States Court of Appeals
## For the First Circuit

No. 05-1970

DAVID PHILLIPS,

Plaintiff, Appellant,

v.

PEMBROKE REAL ESTATE, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Lipez, Circuit Judge,
Cyr and Stahl, Senior Circuit Judges.

Andrew D. Epstein, with whom Lucy Lovrien was on brief, for appellant.
Scott P. Lewis, with whom Edwards Angell Palmer & Dodge LLP was on brief, for appellee.

August 22, 2006

**LIPEZ**, **Circuit Judge**.    This case raises important questions about the application of the Visual Artists Rights Act of 1990 ("VARA"), 17 U.S.C. § 106A, to "site-specific art", which is a subset of "integrated art".    A work of "integrated art" is comprised of two or more physical objects that must be presented together as the artist intended for the work to retain its meaning and integrity.    In a work of "site-specific art", one of the component physical objects is the location of the art.    To remove a work of site-specific art from its original site is to destroy it.

## I.

David Phillips brought suit against Pembroke Real Estate, Inc. in federal district court, asserting that the removal of any or all of his work, consisting of multiple pieces of sculpture and stonework, from Eastport Park in South Boston would violate his statutory rights under VARA and the Massachusetts Art Preservation Act ("MAPA"), Mass. Gen. Laws ch. 231, § 85S.    The district court ruled that VARA recognized integrated art, and that most of Phillips' sculptures and stonework in the Park constituted "one integrated 'work of visual art'" -- with the remaining pieces being "individual free-standing pieces of sculpture, which are not integrated into the other pieces."    It also held that Phillips' integrated work of art was an example of site-specific art.    But the court held that Pembroke could remove Phillips' works from the

Park pursuant to VARA's so-called "public presentation" exception. See 17 U.S.C. § 106A(c)(2).

Phillips challenges that reading of the public presentation exception on appeal. Although we disagree with the district court's reasoning (we hold that VARA does not apply to site-specific art at all), we affirm the decision of the district court permitting Pembroke to remove Phillips' works from the Park.

## II.

### A.  The artist

Phillips is a nationally recognized sculptor who works primarily with stone and bronze forms that he integrates into local environs.  In many of his sculptures, the design of the stones is incorporated into the landscape -- such as a private project in Ogunquit, Maine, where a band of rock was extended into a bronze tributary in the ground, which, in sunlight, glistened like a nearby stream.  In some of his other works, Phillips has merged metals or polished stone with aged, naturally-shaped boulders.

Phillips' commissioned work from the past twenty years can be found at private companies and universities and in public spaces across the United States -- in places such as Massachusetts, Washington, D.C., New York, and Utah -- and internationally -- in places such as Tokyo, Japan and Colombia.  His work has been profiled in both Japanese and American art magazines, and featured

in galleries and museums in, among many places, New York City and Maine.  His 1993 promotional brochure details his artistic themes:

> It is Phillips' inherent reverence for natural beauty in this ecologically ravaged world that influences all his decisions, particularly when he recontextualizes a stone by replacing part of its form with a man-made surrogate or when he gracefully applies typical landscaping and architectural materials along with natural stone and traditional art materials into new equations of form and function.

**B.  The Park**

Eastport Park (the "Park"), which was completed in its current form in the spring of 2000, is located across from Boston Harbor in the South Boston Waterfront District.  The Park is roughly rectangular in shape.  Its borders are formed by the World Trade Center East Office building to the west, D Street to the east, Seaport Boulevard to the north, and New Congress Street to the south.  The Park is a public sculpture park with a nautical theme.

In addition to Phillips, three other artists also crafted art located in the Park.  Japanese sculptor Susumu Shingu created tall kinetic sculptures, Judy McKie contributed bronze, fish-shaped benches, and landscape architect Craig Halvorson designed a pergola (a shady resting place, made of rustic work or latticework on which plants, such as climbing shrubs or vines, are grown).  The Park also contains paths that are inlaid with granite paving stones,

-4-

large granite boulders, and flora meant to evoke an aquatic environment.

Defendant Pembroke Real Estate, Inc. ("Pembroke"), a Fidelity Investments company, leases the land on which the Park is built from the Massachusetts Port Authority ("Massport"). Massport and the Boston Redevelopment Authority must approve any changes to the design of the Park. The Park is required to be open to the public, free of charge, twenty-four hours a day.

## C. Phillips' work in the Park

In 1999, Pembroke commissioned Phillips to work on the Park in conjunction with the development of the World Trade Center East office building that forms the Park's western border. Phillips worked closely with Halvorson on the design of the Park. In fact, he had an oral agreement with Halvorson to act as the artist who worked with the landscape specialists. As part of his work with Halvorson, Phillips aided in the design of a series of repeated spirals that run along the axis of the Park from the northeast to the southwest corner.

To establish the terms of the commission, Phillips and Pembroke executed two contracts in August 1999. Under the "Eastport Park Artwork Agreement", Phillips created approximately twenty-seven sculptures for the Park, comprised of fifteen abstract bronze and granite pieces and twelve realistic bronze sculptures of various aquatic creatures, including frogs, crabs,

and shrimp. Under the "Eastport Park Stonework Agreement", Phillips was responsible for the design and installation of stone walls, granite stones inlaid into the Park's walkways, and other landscape design elements. Most of Phillips' work in the Park is organized along the diagonal axis running from the northeast to the southwest corner, at the center of which is his large spherical sculpture entitled "Chords", the centerpiece of the Park, which Phillips personally carved from granite.

Phillips designed a bronze medallion with Zodiac signs, which crowns an S-shaped circular granite path, also of Phillips' design; outlying sculptures off of the main axis (many bronze crabs, frogs, and shrimp and a large seashell); and the curve motifs. He worked with a stone mason to choose and place the rough lichen-covered, Maine-quarried stone, and he selected the large granite stones that he used as part of his sculptures to mirror the large granite stones along Boston Harbor. Phillips' work in the Park is unified by a theme of spiral and circular forms.

## D. Pembroke's redesign of the Park and the preliminary injunction

In 2001, Pembroke decided to alter the Park. It retained Elizabeth Banks, a British landscape artist, to conduct the redesign. Konstantine Krekis, a member of the original design team, also contributed to the redesign. Believing that the Park's original design had conceptual problems, Pembroke wanted to simplify walkways and include more plants for better shade.

Pembroke also wanted to remove much of the original stone, which had caused maintenance problems.

Banks' redesign plan called for the removal and relocation of Phillips' sculptures. Phillips protested. In January 2003, Pembroke agreed to retain Phillips' rough stone walls and all but one of his sculptures. The new redesign plan would also relocate some of the granite paving and change several walkways and finished granite objects. Objecting to this revised plan, Phillips filed suit in federal district court, seeking injunctive relief under VARA and MAPA.

On August 21, 2003, following a nonevidentiary hearing, the district court issued a temporary restraining order enjoining Pembroke from altering the Park. Subsequently, Pembroke declared its return to the original redesign plan, which would remove nearly all of Phillips' work from the Park. After a two-day evidentiary hearing, the district court issued a memorandum and order in which it found that Phillips had established the likelihood of showing: (1) that most, but not all, of his work in the Park constituted "one 'integrated work of visual art,'" see Phillips v. Pembroke Real Estate, Inc., 288 F. Supp. 2d 89, 98 (D. Mass. 2003) (hereinafter "Phillips I"); (2) "an artist has no right to the placement or public presentation of his sculpture under the exception in § 106A(c)(2)," VARA's public presentation exception (a finding that applied to Phillips' work as both integrated art and

-7-

site-specific art), id. at 100; and (3) that because "the environment of Phillips' integrated sculpture along the axis of the Park is a critical element of those works, [] changing the location of the sculpture constitutes an [impermissible] alteration under" MAPA, id. at 102. Therefore, according to the district court, Pembroke could move Phillips' work from the Park consistent with VARA, so long as Pembroke did not "alter, modify or destroy the 'works of visual art' as [the court] [had] defined them." Id. at 100. In other words, consistent with VARA, Phillips' free-standing works could be moved; and the multi-element, integrated work of art along the northeast-southwest axis could be disassembled and moved piecemeal, so long as individual pieces comprising this integrated work of art were not altered, modified, or destroyed. However, under the broader protections of MAPA for site-specific art, the court granted a preliminary injunction preventing Pembroke from altering the Park.

**E.  Subsequent procedural history**

Both parties filed interlocutory appeals to this court pursuant to 28 U.S.C. § 1292(a)(1). In the interim, the district court certified the question of whether MAPA protected Phillips' work in the Park to the Massachusetts Supreme Judicial Court ("SJC"), and the federal appeals were stayed pending the SJC's resolution of this state law question. See Phillips v. Pembroke Real Estate, Inc., 819 N.E.2d 579 (Mass. 2004) (hereinafter

"Phillips II"). The specific question certified to the SJC was: "to what extent does the Massachusetts Art Preservation Act, Mass. Gen. Laws ch. 231, § 85S (1984), protect the placement of 'site specific' art?" Id. at 580.

The SJC concluded that MAPA did not protect site-specific art. See id. at 585-86. In particular, the SJC highlighted the following: (1) "Phillips's contention that the site can be the 'medium' of such art [wa]s not consistent with [] dictionary definitions [of the statutory term 'medium']," id. at 584; (2) "the Legislature was concerned not only with creating new rights for artists, but also with protecting the rights of property owners who commission artworks that become attached to real property," id.; and (3) "[i]f the Legislature intended to include the type of site-specific art at issue here within MAPA's protections, it would entail a radical consequence for owners of land," id.

In light of the SJC's ruling and its own prior conclusion that it was possible for Phillips' sculptures to be removed from the Park consistent with VARA because of VARA's public presentation exception, the district court vacated the preliminary injunction it had granted and entered judgment on all counts. On appeal, neither party disputes the district court's finding that Phillips' work in the Park along the northeast-southwest axis is both integrated and site-specific art. Additionally, neither party contests the fact that moving any or all of this integrated work from the Park would

-9-

constitute a physical alteration of the work. Phillips, for his part, does not claim on appeal that VARA prohibits the removal of integrated art that is not site-specific.[1] Instead, he claims that VARA prohibits the removal of site-specific art. Therefore, he challenges only the district court's conclusion that the public presentation exception of VARA permits Pembroke to remove from the Park his large, multi-element work of art, which the district court found was both integrated and site-specific.[2]

## III.

### A. Statutory Background

VARA states in relevant part that the "author of a work of visual art":

> (3) subject to the limitations set forth in section 113(d), shall have the right -
>
> (A) to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right, and
>
> (B) to prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right.

---

[1] To be clear, we are not saying that, in fact, Phillips does not believe that VARA prohibits the removal of integrated art that is not site-specific. We are simply saying that he has not raised that issue on appeal.

[2] Attached as an appendix is a diagram of Eastport Park that Phillips attached as Exhibit D to his "Supplemental Memorandum in Support of His Motion for a Preliminary Injunction".

17 U.S.C. § 106(A)(a)(3)(A) and (B). As an exception, § 106A(c)(2) states that:

> The modification of a work of visual art which is the result of conservation, or of the public presentation, including lighting and placement, of the work is not a destruction, distortion, mutilation, or other modification described in subsection (a)(3) unless the modification is caused by gross negligence.

This is the public presentation exception. A "work of visual art" is defined as including "a painting, drawing, print or sculpture, existing in a single copy" or in a limited edition. 17 U.S.C. § 101.

In Carter v. Helmsley-Spear, Inc., 71 F.3d 77 (2d Cir. 1995), the Second Circuit, citing VARA's legislative history, explained that VARA:

> protects both the reputations of certain visual artists and the works of art they create. It provides these artists with the rights of "attribution" and "integrity" . . . . These rights are analogous to those protected by Article 6 bis of the Berne Convention, which are commonly known as "moral rights." The theory of moral rights is that they result in a climate of artistic worth and honor that encourages the author in the arduous act of creation.

Id. at 83 (citing H.R. Rep. No. 101-514, at 5, reprinted in 1990 U.S.C.C.A.N. 6915, 6917).[3] "VARA grants three rights: the right of

_____

[3] The Berne Convention is "an international copyright treaty providing that works created by citizens of one signatory nation will be fully protected in other signatory nations, without the need for local formalities. The treaty was drafted in Berne in 1886 and revised in Berlin in 1908." Black's Law Dictionary, 8th ed. (1999); see also Wikipedia, "Berne Convention for the Protection of Literary and Artistic Works," http://en.wikipedia.org/wiki/Berne_Convention (last visited July

-11-

attribution, the right of integrity and, in the case of works of visual art of 'recognized stature,' the right to prevent destruction." Id.

> The right of attribution generally consists of the right of an artist to be recognized by name as the author of his work or to publish anonymously or pseudonymously, the right to prevent the author's work from being attributed to someone else, and to prevent the use of the author's name on works created by others, including distorted editions of the author's original work. The right of integrity allows the author to prevent any deforming or mutilating changes to his work, even after title in the work has been transferred.

Id. at 81 (internal citations omitted).  In other words, these moral rights protect what an artist retains after relinquishing ownership (and/or copyright) of the tangible object that the artist has created.

Rep. Robert W. Kastenmeier, Chair of the House Judiciary Subcommittee on Courts, Intellectual Property, and the Administration of Justice, summarized VARA's purpose this way:

> [VARA] is . . . a pragmatic response to a real problem. It is directed towards development of Federal rights that would enable visual artists to protect the integrity of their works and the fact of their authorship . . . .  We should always remember that the visual arts covered by this bill meet a special societal need, and their

---

27, 2006) ("The Berne Convention for the Protection of Literary and Artistic Works, usually known as the Berne Convention, is an international agreement about copyright, which was first adopted in Berne, Switzerland in 1886.  It was developed at the instigation of Victor Hugo, and was thus influenced by the French 'right of the author' (droit d'auteur), which contrasts with the Anglo-Saxon concept of 'copyright', which has only been concerned with economic protection.").

protection and preservation serve an important public interest.

H.R. Rep. No. 101-514, at 5.

## B.  Site-specific art

During the preliminary injunction hearing, one of Phillips' experts, Daniel Ranalli, a professor of art history at Boston University, stated:

Beginning at least with the last third of the 20th century, and continuing through the present, the notion of sculpture has undergone a radical redefinition. In essence, sculpture has come off [of] its pedestal, functioning in the space in and around its site, and playing an integral role in defining that space.

Phillips I, 288 F. Supp. 2d at 95.  According to the district court's summary, another of Phillips' experts, Richard Barreto, Executive Director of the Urban Arts Institute of the Massachusetts College of Art, who is involved in the selection of artists to create art in public spaces, testified that:

[T]oday the concept of "site specificity" is the "rallying cry" of public artists who seek to create a piece that derives enhanced meaning from its environment. Much of modern sculpture does not exist separate from its context, but rather integrates its context with the work to form, ideally, a seamless whole.

Id.  Essentially, for site-specific art, the location of the work is an integral element of the work.  Because the location of the work contributes to its meaning, site-specific art is destroyed if it is moved from its original site.  See Francesca Garson, Note, Before That Artist Came Along, It Was Just a Bridge: The Visual Artists Rights Act and the Removal of Site-Specific Artwork, 11

-13-

Cornell J.L. & Pub. Pol'y 203, 211 (2001) ("It is clear that the community of respected American artists and art authorities regard the crafted work and the site of site-specific artworks as an indivisible whole. The artists who create these works explain that the meaning and purpose behind the art lie squarely within its physical location.")

As Halvorson stated in an affidavit, "[t]his view contrasts with so-called 'plop-art' where a separately conceived art object is simply placed in a space." Phillips I, 288 F. Supp. 2d at 95. A piece of plop-art does not incorporate its surroundings. Site-specific art is the opposite of plop-art. In summary, as the district court found below, "[t]he undisputed expert testimony is that in site-specific sculpture, the artist incorporates the environment as one of the media with which he works." Id.

## C. The district court's opinion

We must examine closely the arguments that Phillips presented to the district court, and the district court's responses to those arguments, for two reasons. First, both the statute and the underlying concepts (integrated art and site-specific art) are somewhat complex. Second, the parties could not even agree about the issue on appeal. We must get these basics sorted out before we can analyze the competing arguments.

-14-

## 1. Phillips' arguments to the district court

Before the district court, Phillips sought to prevent Pembroke from altering, moving, or modifying any of his work in the Park in any way. At this time in the chronology of the case, the district court had not yet made its factual finding that Phillips' sculpture and stonework along the northeast-southwest axis comprised a single work of integrated art. Therefore, Phillips first argued that "his sculptures and the related stonework are works of visual art designed specifically for Eastport Park and they reflect and enhance the Park's location adjacent to Boston Harbor and are inseparable from it." In other words, each of his works was site-specific, i.e., each individual piece was integrated with its location in the Park. Phillips also argued that VARA protected each of these works from any change in location because such a change would impermissibly alter them. Under this argument, all of his pieces -- be it any one of his sculptures, or one of the Stone Elements -- "are meaningful only if they remain in Eastport Park, the location for which they were created." As Phillips elaborated:

> if any sculptures are moved or removed, the spirit, integrity and character of [the] installations will be destroyed . . . . [because] the meaning and purpose of the art derives in large part from its physical locations . . . . [E]ven if the sculptures and stonework are rebuilt elsewhere someday, the artwork will never be the same as [I] intended it to be, and as it currently exists.

-15-

As a corollary to this "site-specific, individual work" argument, Phillips also argued that "[r]emoval of [his] site-specific work would not be a permitted 'presentation' or 'placement of the work under the section 106A(c)(2) exception," i.e., that Pembroke's proposed removal of some or all of his work from the Park did not fall within VARA's public presentation exception, which permits certain categories of alterations to works of art.[4]

As alternatives, Phillips asserted two integrated work of art arguments in addition to his site-specific, individual work of art argument. First, he contended that the "Park contains a sufficient number of interrelated works of visual art created by Phillips, so that <u>any</u> modification of <u>any</u> of the interrelated Parts of the Park will have an impact on the other related works, and therefore will be a violation of VARA." In other words, apart from any claim that each of the individual sculptures was site-specific, Phillips claimed that each of his individual pieces in the Park was an element of a single, larger, multi-element work of integrated art such that the removal or modification of any one of these elements in the Park would harm the larger, integrated work and violate VARA.

As a second integrated work of art argument, Phillips argued that while "this court may not have to determine that the

_____

[4] As noted, this "corollary" argument becomes Phillips' sole argument on appeal.

-16-

Park as a whole is a work of visual art protected by VARA," "[i]f [keeping all of my work in the Park] means that Eastport Park must be declared to be an inviolate work of art [as a whole], then so be it." In other words, Phillips argued that, if necessary, he would assert that the Park as a whole, including the work of the other artists, was a single work of integrated art.

## 2. Integrated art

The district court addressed the integrated art question first:

> The first question is whether Phillips' twenty-seven (27) sculptures constitute a single work of visual art or instead are discrete works of art that must be treated separately under VARA. A related issue is whether the Park as a whole should be treated as a work of visual art.
>
> . . .
>
> Phillips takes the position that his artwork extends beyond the[] individual sculptures and includes the finished and rough-hewn granite and stone pavings and the stone walls that he designed and placed, including the "Chords" path and the medallion path (the "Stone Elements"). He also contends that all of his sculptures form one integrated, interrelated work of visual art. To place the sculptural elements in different alignments relative to one another . . . would destroy sight lines and alter the deliberately-crafted spatial relationships among the paths, granite walls, and individual pieces of sculpture.

Phillips I, 288 F. Supp. 2d at 97-98.

The district court had to decide whether the phrase "work of visual art", as used in VARA, encompassed the concept of integrated art. The district court first looked to the few

-17-

existing cases addressing VARA.  The court found that "courts have held that works composed of a variety of pieces and in a variety of media may still constitute one work of 'visual art' under VARA." Id. at 98 (citing Carter, 71 F.3d at 83-84; English v. BFC & R E. 11th St. LLC, No. 97-7446, 1997 WL 746444, at *3 (S.D.N.Y. 1997); and Pavia v. 1120 Ave. of the Americas Assoc., 901 F.Supp. 620, 627-28 (S.D.N.Y. 1995)).  The district court next looked to legislative history, particularly a statement instructing courts to:

> use common sense and generally accepted standards of the artistic community in determining whether a particular work falls within the scope of the definition [of "work of visual art"].  Artists may work in a variety of media, and use any number of materials in creating their works. Therefore, whether a particular work falls within the definition should not depend on the medium or materials used.

Id. at 98-99 (quoting H.R. Rep. No. 101-514, at 6).  Based on the case law and legislative history, the district court found that VARA embraced the concept of integrated art: "Despite [Congress'] narrow definition, courts have held that works composed of a variety of pieces and in a variety of media may still constitute one work of 'visual art' under VARA."  Id. at 98.

What remained was a question of fact: whether all of Phillips' work in the Park constituted a single work of visual art? The district court found that:

> the sculptures along the northwest to southeast axis of the Park, including "Chords" and the medallion sculpture, as well as the Stone Elements, are one integrated "work

-18-

of visual art." It begins with a spiral in the northwest corner along Seaport Boulevard, includes Plaintiff's "Chords" sculpture, and continues along a spiral path of mosaic paving stone, culminating in the bronze medallion. In determining that the sculptures along this axis, as well as the related Stone Elements, are one work of visual art, the Court relies on the integrated marine theme and recurring spirals, as well as the use of marine granite boulders and pavers. However, the remainder of the sculptures . . . that do not lie along the axis are not part of the same work of visual art. While these sculptures share the marine theme, the Court finds these pieces are individual free-standing pieces of sculpture, which are not integrated into the other pieces by spirals or granite.

Id. at 98.[5] In other words, the district court concluded that most of Phillips' pieces in the Park constituted a single work of integrated art, but it rejected his position that all of his pieces comprised a single work of art.

The district court then addressed Phillips' argument that the Park itself is an integrated work of art:

[o]ne novel issue is whether a park can be a "work of visual art" under VARA. Phillips contends that the Eastport Park as a whole is one large integrated piece of "sculpture."

The Court rejects Plaintiff's argument that the Park as a whole is a work of visual art. As [] Barreto conceded, a park does not fit within the traditional definition of sculpture . . . . Conceivably, a sculptor could design a sculpture garden that includes multiple inter-related sculptural elements that form an integrated work of visual art . . . . However, here, many elements in the Park were not created by Phillips . . . . Substantial

_____

[5] The district court mistakenly refers to the works along the "northwest-southeast" axis of the Park, Phillips I, 288 F. Supp. 2d at 93, 98. The correct compass directions are northeast and southwest, as found later in the district court's order. See id. at 105.

-19-

> areas of the Park are unrelated to Phillips' sculpture
> and not integrated with it . . . . While Phillips
> certainly assisted in designing the stone elements in the
> paths and walls and in placing his own sculptures, the
> Park as a whole is not an integrated work of art.

Id. at 98-99 (internal citation omitted). In deciding whether the Park was an integrated work of art, the district court left open the legal question of whether a park could ever be a "work of visual art" as defined by VARA. Instead, it held that, assuming a park could be a work of integrated art recognized by VARA, the Park was not such a work.

Finally, the district court's conclusion that VARA applied to integrated art, and its related conclusion that Phillips had created a work of integrated art in the Park, did not prevent the removal of Phillips' works from the Park. That was so because the district court also concluded that integrated art was subject to the public presentation exception of VARA, § 106A(c)(2). Phillips' integrated work of art could still be disassembled and moved so long as the "works of visual art" are not "alter[ed], modif[ied], or destroy[ed]." Id. at 100.[6]

---

[6] As we explain further, this ruling about the application of VARA to integrated art, exclusive of site-specific art, is not challenged on appeal. It is a fact that art museums are filled with works of art comprised of multiple pieces. These works often travel from museum to museum. Their disassembly and reassembly for the purpose of relocation at another museum does not create VARA liability.

### 3. Site-specific art

There remained Phillips' site-specificity argument. If Phillips could show that: (1) his work in the Park was site-specific art; (2) VARA protected site-specific art; and (3) that the public presentation exception did not apply to site-specific art, none of his work could be moved, even on a piecemeal basis.

Phillips convinced the district court that most of his work in the Park was site-specific as well as integrated. In discussing the issue of site-specificity as part of its discussion of MAPA, the district court made the following factual finding:

> I find that Phillips' sculpture has a marine theme that integrates the large granite stones of the park with his sculpture and the granite sea walls of Boston Harbor into one interrelated visual work of art. Therefore, Phillips used the harborside location at Eastport Park as one medium of his art. To move Phillips' integrated work of visual art (i.e., the sculptures, boulders, and granite paths along the axis, which I described in the VARA discussion) to another location (particularly a non-marine one) would be to alter it physically.

Phillips I, 288 F. Supp. 2d at 102.[7]

Having made this finding on the site-specific nature of Phillips' work, the district court explained the positions of Phillips and Pembroke on site-specificity:

---

[7] The district court's factual finding that the works along the northeast-southwest axis constituted a single work of integrated art, and that this integrated work was also site-specific, may explain why, on appeal, Phillips abandons his argument that his sculptures and stonework, on an individual basis, including the now free-standing ones, are site-specific.

> [Phillips] [] argues that his work is so site-specific that moving it would be an intentional destruction or modification under VARA. Taking the sculpture from its current location and locating it on a private campus in Rhode Island not near the ocean . . . would be like painting over the background landscape in the Mona Lisa.
>
> [Pembroke] contends that the "public presentation" exclusion in § 106A(c)(2) permits it to move plaintiff's sculptures from their current placement to another, just as the statute would not prevent a curator from moving the Mona Lisa from one wall in the Louvre to another.
>
> Section 106A(c)(2) has been interpreted to exclude from VARA's protection "site-specific" works, works that would be modified if they were moved.

Id. at 99 (citation omitted). The district court then referenced one of the few relevant cases, see Bd. of Managers of Soho Int'l Arts Condo. v. City of New York, No. 01-1226, 2003 WL 21403333, at *10 (S.D.N.Y. 2003) (stating that VARA's objective "is not . . . to preserve a work of visual art where it is, but rather to preserve the work as it is") (hereinafter "Soho I"); Bd. of Managers of Soho Int'l Arts Condo. v. City of New York, No. 01-1226, 2003 WL 21767653, at *3 (S.D.N.Y. 2003) (hereinafter "Soho II"). It then found Pembroke's legal argument "more persuasive because it is rooted in the plain language of the exclusion in § 106A(c)(2) as well as the statute's legislative history." Phillips I, 288 F. Supp. 2d at 100; see also id. ("'Generally, the removal of a work from a specific location comes within the [presentation] exclusion because the location is a matter of presentation.'") (quoting H.R. Rep. No. 101-514, at 12).

-22-

Finally, the district court highlighted the fact that the public presentation exception "was crafted after the widely-publicized dispute between the General Services Administration and the artist Richard Serra over the removal of Serra's 'site-specific' piece 'Tilted Arc.'" Id.; see also Serra v. United States Gen. Serv. Admin., 847 F.2d 1045 (2d Cir. 1988). In Serra, the Second Circuit rejected the plaintiff's argument that the removal of an integrated, site-specific, government-owned work of art from federal property violated the free expression and due process rights of the artist. See Serra, 847 F.2d at 1045. The district court inferred that because VARA and the public presentation exception were adopted after Serra, Congress must have been aware of site-specific art. Yet VARA says nothing that suggests special protection for site-specific art. Therefore, the district court concluded that:

> an artist has no right to the placement or public presentation of his sculpture under the exception in § 106A(c)(2). [Pembroke] is not obligated to display the works in the Park, as VARA provides no protection for a change in placement or presentation. However, under VARA, [Pembroke] is under an obligation not to alter, modify or destroy the "works of visual art" as I have defined them.

Id. at 100.[8]

_____

[8] When the district court refers to the obligation of Pembroke not "to alter, modify, or destroy the 'works of visual art' as I have defined them," it means that the individual pieces of sculpture, and the Stone Elements, that comprise the integrated work of art must not be altered, modified, or destroyed. Otherwise, the disassembled work of integrated art could not be

-23-

This is the conclusion that Phillips challenges on appeal. As he puts it: "the District Court misinterpreted the language and Legislative history of the [public presentation exception], and [] VARA protects Phillips' artwork from the removal planned by Pembroke." Pembroke asserts, inter alia, that the district court ruled correctly that the public presentation exception negates any protection VARA extends to site-specific art. More fundamentally, it argues that VARA does not apply to site-specific art at all.

**IV.**

Our review of the district court's decision is de novo. See Riva v. Commonwealth of Massachusetts, 61 F.3d 1003, 1007 (1st Cir. 1995) ("A district court's resolution of a question of statutory interpretation engenders de novo review in the court of appeals."). "We are not wedded to the lower court's rationale, but, rather, may affirm its order on any independent ground made manifest by the record," InterGen N.V. v. Grina, 344 F.3d 134, 141 (1st Cir. 2003). "As in all statutory construction cases, we begin with the language of the statute." Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002). Furthermore, "[w]e have consistently held that when the plain meaning of a statute is clear, we are not to look beyond that text to discern legislative intent." Palmieri v. Nynex Long Distance Co., 437 F.3d 111, 115 (1st Cir. 2006);

reassembled later at another location.

-24-

see also <u>Bonilla</u> v. <u>Muebles J.J. Álvarez, Inc.</u>, 194 F.3d 275, 277 n.2 (1st Cir. 1999) (When "the plain meaning of the statute resolves the issue <u>sub judice</u>, we need not rummage through the legislative history or search for other interpretive aids.").

## A. The district court's understanding of site-specific art and VARA

To help explain our holding that VARA does not apply to site-specific art, we must begin with a restatement of the district court's view of the interaction between VARA and site-specific art. On the one hand, the district court accepted the concept of site-specific art. It credited the unopposed testimony of Ranalli, Phillips' expert, "that for site specific art, the location of the work is a constituent element of the work." <u>Phillips I</u>, 288 F. Supp. 2d at 95. The district court understood that "[u]nder this approach, because the location defines the art, site-specific sculpture is destroyed if it is moved from the site." <u>Id.</u> The district court also found that "[t]o move Phillips' integrated work of visual art (i.e., the sculptures, boulders, and granite paths along the axis . . . described in the VARA discussion) to another location . . . would be to alter it physically," <u>id.</u> at 102.

On the other hand, in the section of its opinion addressing Phillips' site-specificity argument -- entitled "'Public-Presentation' Exclusion" -- the district court noted that "Section 106A(c)(2) has been interpreted to exclude from VARA's protection 'site-specific' works, works that would be modified if

they were moved." Phillips I, 288 F. Supp. 2d at 99. It then referenced Soho I ("[T]he point of VARA 'is not . . . to preserve a work of visual art where it is, but rather to preserve as work as it is,'" 2003 WL 21403333, *10) and Soho II ("'[N]owhere in VARA does the statute make any legal distinction between site-specific or free-standing works,'" 2003 WL 21767653, at *3). The district court concluded "that an artist has no right to the placement or public presentation of his sculpture under the exception in § 106A(c)(2)." Phillips I, 288 F. Supp. 2d at 100. In short, the district court found that while VARA applies to site-specific art, the public presentation exception permits the removal of site-specific art, e.g., Phillips' work in the Park.

Without in any way diminishing our respect for the district court's careful handling of this difficult case, we find its analysis of VARA's relationship to site-specific art unpersuasive. By definition, site-specific art integrates its location as one of its elements. Therefore, the removal of a site-specific work from its location necessarily destroys that work of art. Here, the district court concluded that VARA recognized site-specific art as a type of integrated art, and then concluded that VARA treats site-specific art the same way that it treats other integrated art.[9] However, a work of integrated art, unless it is

_____

[9] A simple example of a work of integrated art that is not site-specific is Marcel Duchamp's work "Bicycle Wheel", a sculpture integrating a bicycle fork, a bicycle wheel, and a stool in a

-26-

a site-specific work, is not destroyed by removal from its location.

By concluding that VARA applies to site-specific art, and then allowing the removal of site-specific art pursuant to the public presentation exception, the district court purports to protect site-specific art under VARA's general provisions, and then permit its destruction by the application of one of VARA's exceptions. To us, this is not a sensible reading of VARA's plain meaning. Either VARA recognizes site-specific art and protects it, or it does not recognize site-specific art at all.

## B. Phillips' position on appeal

Phillips recognizes the same tension in the district court's holding that we have identified, but he resolves it differently. He agrees with the district court's position that VARA applies to site-specific art (as well as integrated art), but disagrees with the district court's view that the public presentation exception permits the removal of site-specific art.

---

particular arrangement. See Museum of Modern Art, "Bicycle Wheel", http://www.moma.org/collection/browse_results.php?object_id=81631 (last visited July 27, 2006)(image); see also Wikipedia, "Bicycle Wheel", http://en.wikipedia.org/wiki/Bicycle_Wheel (last visited July 27, 2006). However, this sculpture does not integrate its location and could be part of a traveling exhibition of Duchamp's work without losing its artistic meaning or being destroyed.

## 1. The public presentation exception

To circumvent the district court's view of the public presentation exception,[10] Phillips argues that VARA prevents the removal of site-specific art because the public presentation exception does not apply to site-specific art. His argument begins with a claim that the words "presentation" and "placement" in the public presentation exception are ambiguous on the issue of location. We find nothing remotely ambiguous about the word "presentation", which is modified by the word "placement". The word "placement" inescapably means location. Noting this fact, Phillips claims that "the word placement could suggest something that is temporary, as in the placement of furniture, or it could refer to something more permanent, as in the placement of a massive piece of sculpture." Phillips then asks the question that he describes as pivotal: "does the word placement include something that is securely fixed in a particular position as in the case of . . . [his] integrated work of visual art that spans the northeast-southwest axis of the Park?"

---

[10] We repeat here the language of § 106A(c)(2), the public presentation exception:

> [t]he modification of a work of visual art which is the result of conservation, or of the public presentation, including lighting and placement, of the work is not a destruction, distortion, mutilation, or other modification described in subsection (a)(3) unless the modification is caused by gross negligence.

To answer this question, Phillips invokes the doctrine of noscitur a sociis, which counsels that words in a statute should be understood in the context of the terms around it. See Microsoft Corp. v. Comm'r, 311 F.3d 1178, 1184 (9th Cir. 2002). Relying on this doctrine, Phillips asserts that "lighting and placement must be read to be related to each other and be words of equal significance. If lighting refers to non-permanent changes in public presentation, then placement must also refer to non-permanent changes in public presentation." Phillips continues: "[b]uried within the "placement" term is the assumption that the object is moveable, and can be placed in various locations. This assumption must be examined. Site-specific artwork is a well-recognized form of art, but it is not always moveable."

We agree with Phillips that the premise of the public presentation exception is artwork that can be moved in some fashion, such as paintings or sculptures -- that is, art that is not permanently affixed or "integrated" in such a way that the mere act of moving it would destroy it. The possibility of change without destruction is implicit in the public presentation exception. The public presentation exception defines the types of changes, such as those in lighting and placement, that do not constitute "destruction, distortion, or mutilation". But Phillips draws a startling conclusion from the public presentation exception's focus on permissible change in the presentation of a

-29-

work of visual art: because the public presentation exception addresses itself only to "plop-art", that is, those works of art subject to temporary changes in such matters as lighting and placement, and declares further that such modifications of a work of visual art are not "destroying, distorting, or mutilating" them, the public presentation exception does not apply to site-specific art, which, as everyone acknowledges, cannot be removed from its location without destroying it. This approach leaves Phillips with the district court's holding that VARA applies to site-specific art, minus the court's related holding that the public presentation exception permits the removal of such art. In this way, the tension that we identified in the district court's decision disappears.

## 2. Dual regime

With his position on VARA and the public presentation exception, Phillips argues that VARA essentially creates a dual regime -- words that mean one thing as applied to non-site-specific art have a different meaning when applied to site-specific art. Beyond his reading of the public presentation exception itself, Phillips cites only one other provision of VARA in support of his dual regime argument -- § 113(d)(1)(A) of VARA, the so-called "building exception", which excludes from VARA's protection "a work of visual art [that] has been incorporated or made a part of a building in such a way that removing the work from the building

-30-

will cause the destruction, distortion, mutilation, or other modification of the work as described in section 106A(a)(3)." Phillips asserts that because VARA provides an exception to VARA for artwork attached to buildings, but does not contain a similar provision for site-specific art (understood as art attached to real property), VARA must protect site-specific art.

With both the public presentation and building exceptions, Phillips is arguing that VARA's silence on a subject is actually evidence that the statute addresses that subject. To say the least, this is an odd way to read a statute. If VARA actually established such a complicated, dual regime, we would expect that the phrase "site-specific", or some equivalent, would appear in the language of the statute. There is no such phrase anywhere. Indeed, we would expect much more than just a reference to site-specific art. We would expect an elaboration of how to differentiate between site-specific and non-site-specific art (plop-art). That elaboration is nowhere to be found.

Moreover, the creation of a dual regime -- which would require us, essentially, to rewrite VARA -- has potentially far-reaching effects beyond the protection of Phillips' work in the Park. Once a piece of art is considered site-specific, and protected by VARA, such objects could not be altered by the property owner absent consent of the artist. Such a conclusion could dramatically affect real property interests and laws.

For example, as Pembroke argues in its brief, Phillips' work in the Park "lies within a rapidly changing urban area and extends beyond Eastport Park to Boston Harbor." If a dual regime were created, there is the potential that:

> not only would Pembroke's ability to move [Phillips'] work or alter Eastport Park be subject to Phillips' approval, but also the owners of nearby property who had nothing to do with the purchase or installation of Phillips' works would be subject to claims that what they do with their property has somehow affected the site and has, as a result, altered or destroyed Phillips' works.

In discussing the possibility of MAPA protecting site-specific art, the SJC echoed this concern, observing that the creation of a dual regime under MAPA "would entail a radical consequence for owners of land, that the Legislature directly averted for owners of buildings. Specifically, rights afforded artists would encumber private and public land with restrictions lasting for the life of the artist plus fifty years, without the need for such restrictions to be recorded in a registry of deeds." Phillips II, 819 N.E.2d at 584-85. The SJC ultimately refused to:

> read such an intent into a legislative act given the recognized legislative policy of disparaging land restrictions (especially unrecorded ones), the common-law doctrine disapproving the long-term burdening of property, and the corollary judicial practice of construing statutory provisions regarding land restrictions in favor of freedom of alienation.

Id. at 585 (internal quotation marks omitted).

The Supreme Court has also emphasized the principle that "statutes which invade the common law are to be read with a

presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." United States v. Texas, 507 U.S. 529, 534 (1993) (internal citations and quotation marks omitted); see also Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 108 (1991). "In such cases, Congress does not write upon a clean slate. In order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law." Texas, 507 U.S. at 534 (internal citations and quotation marks omitted). Phillips' argument that VARA's silence on the subject of site-specific art affords special protection to site-specific art hardly meets this requirement of direct address.[11]

Ultimately, we agree with Pembroke's position that "[t]here is no basis for Phillips' claim that VARA establishes two different regulatory regimes: one for free-standing works of art . . . and one for site-specific art that can never be moved and must always be displayed." VARA's plain language also requires us to

---

[11] As a partial response to these concerns about the burdening of property rights, Phillips cites § 106A(e) of VARA, which allows artists to waive their VARA rights. Phillips asserts that "Pembroke had an opportunity to require Phillips to waive his VARA rights[, but] Pembroke failed to take advantage of this provision." This flawed argument presupposes that VARA protects site-specific art in the first place; Phillips has failed to prove this presupposition. Phillips cannot argue that Pembroke must ask him for a waiver of moral rights that he has not proven he possesses. In other words, Phillips cannot use the possibility of a waiver of moral rights under VARA as the basis for creating those rights in the first instance. Phillips has turned the logic of waiver on its head. His waiver argument is unavailing.

reject the district court's approach to site-specific art.  VARA does not protect site-specific art and then permit its destruction by removal from its site pursuant to the statute's public presentation exception.  VARA does not apply to site-specific art at all.[12]

## IV.

We do not denigrate the value or importance of site-specific art, which unmistakably enriches our culture and the beauty of our public spaces.  We have simply concluded, for all of the reasons stated, that the plain language of VARA does not protect site-specific art.  If such protection is necessary, Congress should do the job.  We cannot do it by rewriting the statute in the guise of statutory interpretation.

**Affirmed**.

---

[12] "The words of the statute are the first guide to any interpretation of the meaning of the statute." Greebel v. FTP Software, Inc., 194 F.3d 185, 192 (1st. Cir. 1999).  However, on occasion, "[b]oth this court and the Supreme Court have checked a sense of a statute's plain meaning against undisputed legislative history as a guard against judicial error." Id. at 192.  Here, there is a dispute about VARA's legislative history.  Both parties have found statements from legislators that support their position.  Nevertheless, there is one inescapable fact about this history: the concept of site-specific art is never mentioned by name.  That history only confirms our sense of VARA's plain meaning.

